LORRAINE B. LEMKE AND KENNETH H. LEMKE, APPELLEES, V. METROPOLITAN UTILITIES DISTRICT, A POLITICAL SUBDIVISION, APPELLANT.

502 N.W.2d 80

Filed June 18, 1993.    No. S-90-1010.

Thomas A. Wurtz and Daniel G. Crouchley for appellant.

John R. Douglas, of Cassem, Tierney, Adams, Gotch & Douglas, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, FAHRNBRUCH, and LANPHIER, JJ.

Shanahan, J.

In a negligence action brought under the Political Subdivisions Tort Claims Act, Neb. Rev. Stat. § 13-901 et seq. (Reissue 1987), Lorraine B. Lemke and Kenneth H. Lemke obtained judgments against Metropolitan Utilities District of Omaha (MUD), which has appealed.

## STANDARD OF REVIEW

"A district court's factual findings in a case brought under the Political Subdivisions Tort Claims Act will not be set aside unless such findings are clearly incorrect." *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 125, 403 N.W.2d 335, 338 (1987). Accord, *Zeller v. County of Howard*, 227 Neb. 667, 419 N.W.2d 654 (1988); *Hughes v. Enterprise Irrigation Dist.*, 226 Neb. 230, 410 N.W.2d 494 (1987).

> In a bench trial of a law action, a trial court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. In reviewing a judgment awarded in a bench trial of a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence.

*Broekemeier Ford v. Clatanoff*, 240 Neb. 265, 267, 481 N.W.2d 416, 418 (1992). Accord, *Young v. Dodge Cty. Bd. of Supervisors*, 242 Neb. 1, 493 N.W.2d 160 (1992); *Ballard v. Giltner Pub. Sch.*, 241 Neb. 970, 492 N.W.2d 855 (1992).

## FACTUAL BACKGROUND

*The Lemke House.*

Lorraine Lemke resided in Omaha, where she lived in a house owned jointly by her and her husband, Kenneth. In 1968, Lemkes had acquired and moved into an older, previously owned house. Jason, Lemkes' 13-year-old son, also lived in the house, which was originally a single-family dwelling but had been converted into five apartments, that is, two apartments on the main floor, two upstairs, and one in the basement. However, on April 27, 1987, Lemkes had no tenants. The main-floor apartments were served by two natural gas ranges.

Additionally, there was a gas range in the upstairs apartment which Lemkes sometimes used. The ranges were already installed when Lemkes bought the house. At times, the wind blew out the pilot lights on the ranges. Either Lorraine or Kenneth relighted the pilot lights by using a match to ignite a burner on the range. Lemkes needed no major repairs on any of the ranges, although MUD's servicemen were occasionally summoned to make adjustments on Lemkes' gas appliances.

*The Explosion.*

On April 27, 1987, Lorraine awoke at 6 a.m., got up, walked into Jason's room to awaken him for school, brought in the morning newspaper, and went into the kitchen to read the paper. Throughout this time, Lorraine smelled nothing unusual, but when she later entered the first-floor bathroom, she smelled the odor of gas which she believed had entered through an open bathroom window after emanating from a "truck spilling gas" on a nearby street.

As Lorraine was walking Jason toward the front door so that he might catch a schoolbus at 7 a.m., both Lorraine and Jason smelled gas in the entryway, an odor similar to that detected on previous occasions when a pilot light had gone out on one of the ranges. After Jason boarded the bus, Lorraine took matches from the main-floor kitchen and climbed the stairway to the second-floor apartment which contained a gas range. In that apartment, Lorraine discovered that the range's pilot light was out. She then struck a match, turned one of the burner control knobs to the "on" position, and attempted to light the stove. As she was attempting to light the burner, "the whole stove was engulfed in flames. And then the flames were shooting to the ceiling." Part of the apartment's floor collapsed, and Lorraine fell two floors into the basement, where she staggered up the basement stairs, then went outside and across the street to obtain help. Because her clothing had been incinerated or blown off, a man covered Lorraine with a blanket until the rescue squad arrived.

## LEMKES' LOSSES

*Injuries and Medical Expenses.*

Lorraine Lemke was transported to a hospital, admitted to

its emergency room, and then taken to surgery for medical attention to her burned body. Dr. Joel Bleicher, a specialist in plastic surgery, made the initial diagnosis of Lorraine's condition and undertook treatment of her injuries. According to Dr. Bleicher, Lorraine had sustained second degree burns on her face, third degree burns to both of her hands, and burns on her legs, and had suffered the loss of several fingernails. Also, there was loss of skin on Lorraine's abdomen and chest. Dr. Bleicher determined that Lorraine had suffered burns on 60 percent of her body.

As one of the first steps in treating Lorraine on April 27, Dr. Bleicher commenced debridement (removal of dead tissue) with a dermatome, a "razor blade sharp apparatus that is either oscillated by hand or by some mechanical power apparatus and it shaves the layers of dead skin off the body." Also, Lorraine was placed on a ventilator "to breathe for" her.

On May 1, after additional debridement on Lorraine's legs and torso, skin grafting was undertaken, and the grafts were "stapled into position." The total graft area at that time covered 500 square centimeters on Lorraine's body. On May 5, Dr. Bleicher continued debridement on Lorraine's legs and torso. A catheter was inserted for supplying Lorraine with nutrition and medication. A tracheostomy (surgically opening the trachea) was necessary for "long-term intubation for ventilation" on account of edema or swelling in Lorraine's throat that caused "respiratory insufficiency." Consequently, a tube was inserted into Lorraine's trachea and connected to a ventilator. Also, a laryngoscopy (examination of the interior larynx) was performed to determine whether Lorraine's vocal cords had been damaged by the explosion and fire. A "burn vest" was applied to reduce Lorraine's bodily movement in the areas where the skin grafts had been applied. The catheter was surgically replaced on May 8 and 16. At that time, there was additional debridement and grafting, that is, grafts of 120 square centimeters on Lorraine's right hand and 216 square centimeters on her right thigh. This was a continuation of "numerous reconstructive procedures to obtain skin coverage" in the burned areas. On May 29, Dr. Bleicher performed "several debridements" for grafts to Lorraine's feet.

Throughout this time, Lorraine's condition required attention from several specialists in addition to Dr. Bleicher; for instance, examinations by an internist relative to infection and attendance by a psychiatrist on account of the trauma involved in the entire episode.

Lorraine was confined to intensive care from April 27 to May 20, was assisted by a ventilator from April 27 to May 15, and was fed intravenously from April 27 to June 11. At the hospital, Lorraine also received physical therapy on account of burns and reconstructive surgery. Lorraine was discharged from the hospital on July 8.

According to Dr. Bleicher, the fire caused severe scarring to Lorraine, with obvious discoloration due to "donor sites for skin grafts," and increased Lorraine's risk of skin cancer. Doctor and hospital expenses for Lorraine totaled $144,044. Also, Dr. Bleicher felt that Lorraine would require additional surgery and hospitalization as the result of her injuries sustained in the explosion and fire.

*Property Damage.*

Additional damages to the Lemkes included total destruction of their house, which had a fair market value of $60,000 before the explosion and fire; loss of personal property valued at $9,362; and demolition costs of $4,300, payable to the city of Omaha.

## THE COBRA FLEXIBLE CONNECTOR
*Warning from the American Gas Association.*

In 1926, MUD became the sole retailer of natural gas for Omaha, and it has been a member of the American Gas Association (AGA) since at least 1965. AGA is a trade organization of natural gas producers, transmission companies, and distributors. MUD belonged to AGA to keep informed of developments in the gas industry, including information regarding dangers in gas distribution.

The Cobra Metal Hose Company manufactured a corrugated metal flexible tubing used to connect a gasline with a customer's appliance. Some flexible connectors, especially those manufactured by Cobra, have a soldered or brazed joint that connects the tubing to fittings for the gasline and

appliance. Between 1961 and 1963, MUD installed at least 4,000 Cobra connectors in homes of MUD customers. However, in 1968, Cobra discontinued manufacturing the flexible connector.

On December 14, 1979, the U.S. Consumer Product Safety Commission (CPSC) sent AGA a letter containing a warning about the dangers of the Cobra flexible connectors. AGA, on December 19, 1979, issued a "Safety Bulletin" to all its members, notifying them of the CPSC letter. Attached to the AGA "Safety Bulletin" was a copy of the CPSC letter and a sample of a "Safety Notice" for warning customers concerning the dangers of flexible connectors.

AGA regularly prepared and distributed a directory to its members. An updated AGA directory was published and sent to all AGA members every 6 months. In January 1980, the directory included a "Special Announcements" section that contained the following:

### NOTICE

The Consumer Product Safety Commission has advised A.G.A. regarding a potential safety problem in reference to a certain type corrugated metal hose. The problem brought to CPSC's attention concerns a gas connector with a button type end fitting brazed directly to the tubing. Our information indicates the unit was manufactured by Cobra Metal Hose in Chicago, Illinois from 1955-1964. Apparently, the brazed construction can deteriorate with age, and with movement or stress, the joint could break allowing escape of gas.

As of January 1, 1968, the ANSI Standard Z21.24 covering metal gas connectors was revised in an effort to prevent this situation.

The specific manufacturer, Cobra, is no longer in business. A.G.A. has sent a special bulletin to all member utility companies advising them of the potential problem and suggesting that they initiate appropriate action within their service area. If you desire further information, please contact your gas company.

Although MUD received the AGA directory, MUD placed the publication in its engineering department's library as a

reference manual in the event that any engineer needed information about a project. Consequently, MUD did not distribute the AGA directory or its information to MUD's service department and its service personnel. Also, MUD did not take any specific steps to warn its customers about the hazards of the Cobra connector. However, MUD did have a program of general information to the public and its customers concerning the benefits and risks involved in using natural gas for home appliances. Illustrations of this general information included a "scratch and sniff" brochure to identify odorized natural gas: "If you ever detect faint whiffs of this odor, investigate. If possible 'follow your nose' to the source. It may be only a pilot light that's out . . . something easily and safely corrected." Also, MUD supplied general safety messages disseminated by the media, such as a newspaper message that informed the general public that a "slight odor near a gas appliance may mean a pilot light needs relighting, and most people can do that." Additionally, MUD used "bill stuffers," a document accompanying a bill sent to a customer for gas service. As bill stuffers for 1986, MUD scheduled several items such as instructions pertaining to planting trees or digging when underground gas mains might be involved, information regarding a "Level Payment Plan" that spread the cost of gas service over 12 months, and general information relative to a sewer use fee and an energy conservation loan fund. Mailing a bill stuffer concerning a free safety inspection in mid-September 1986 was canceled by the manager of MUD's "gas operations," which controlled the mechanical service department and its personnel. MUD's service personnel went to Lemkes' house at least three times after issuance of the AGA warning in January 1980. Those visits involved work on gas appliances, e.g., furnace and water heater, but also included adjustment of a gas range in the Lemke home on February 18, 1986, for which Lemkes paid a service charge.

## LEMKES' ACTION AGAINST MUD

Pursuant to the Political Subdivisions Tort Claims Act, Lemkes sued MUD for its negligence concerning the explosion and fire at the Lemke residence. In addition to denying

negligence and alleging Lemkes' contributory negligence as a bar to recovery, MUD claimed that its conduct was exempt from liability in accordance with the Political Subdivisions Tort Claims Act, namely, § 13-910(2), which stated that the act shall not apply to "[a]ny claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion be abused."

## THE TRIAL

*Lemkes' Witnesses.*

At trial, Robert Harrison testified for the Lemkes. Harrison was a consulting engineer who concentrated in gas fires and explosions. According to Harrison, the Cobra connector was an especially bad device because the soldered or brazed joints tended to deteriorate gradually as the result of phosphorus in the solder or brazing alloy, which, over a span of years, is adversely affected by the sulfur added to the natural gas to provide a distinctive odor to the otherwise odorless natural gas. Although there was no record that MUD had ever installed a Cobra connector in Lemkes' house, from photographs taken by MUD's claim adjusters Harrison identified the tubing for the upstairs range as a Cobra connector. Harrison testified that

> the phosphorus was part of the solder or brazing material, the metal that was used. The sulphur comes from the gas, because the mercaptan is a sulphur component odorant put into natural gas . . . . [T]here's a chemical reaction that destroys the integrity of the joint, allowing it to fall apart.

As Harrison explained, in view of the circumstances existing at the Lemke house on the morning of the explosion, gas from an unlighted pilot light would not accumulate in a sufficient quantity to allow an explosion, that is, supply an "explosive mixture." Rather, the source of the gas, resulting in the explosion, was a broken connector between the gasline and the range which Lorraine Lemke attempted to light. The broken connector supplied an "extreme" amount of gas.

Charles Lamar, a consultant who investigates fuel gas accidents, also testified for Lemkes and, in testimony

substantially similar to Harrison's, described "corrosion cracking," that is, failure of a joint involving a Cobra connector as the result of "butt brazing" when "the end of the tubing is pressed against a flat surface and attached to it by brazing." From the MUD photographs, Lamar also identified the Cobra brand corrugated connector between the gasline and the range involved in the explosion at Lemkes' house. Lamar also discounted the possibility that gas from an unlighted pilot light could accumulate in a sufficient volume for the explosion when Lorraine Lemke attempted to light the burner on the range in the upstairs apartment.

*MUD's Witnesses.*

In its case, MUD presented testimony from its supervisor of engineering operations, who acknowledged that MUD had in fact used Cobra flexible connectors in supplying gas for customers' appliances and that MUD had received the AGA publications. Also, the assistant general manager of operations at MUD testified that MUD had no procedure for distributing AGA information concerning the Cobra connector and never instructed its service personnel to be on the "lookout" for Cobra connectors. MUD's assistant general manager acknowledged that MUD could have instructed its service personnel to check for Cobra connectors when service calls were made for any reason to a customer's home, especially since MUD had used Cobra connectors, and that discovery of a Cobra connector might have resulted in a "red tag" having been placed on an appliance, alerting "the customer that there's a deficiency in their [gas] system" and a need for repair.

One of MUD's expert witnesses, Richard Devine, a safety and technical specialist with Peoples Natural Gas, which serves part of Kansas, Colorado, Nebraska, Iowa, and Minnesota, explained his company's response to the AGA and CPSC warnings. According to Devine, Peoples, early in 1980, sent a notice to its various field offices, explaining the problems with flexible connectors, and in 1984, another notice went out from Peoples' corporate headquarters in the form of a letter over Devine's signature. This letter told various area people that if connectors of the type pointed out in the CPSC notice were

discovered by Peoples' personnel in the course of routine service work, the service personnel were to recommend that the connectors be removed and replaced with safe connectors.

*The District Court's Findings and Judgments.*

At the conclusion of the evidence, the trial court concluded that the explosion was due to gas escaping from a separation between the Lemke range's flexible connector and the gasline and that MUD, notwithstanding its notice that the flexible connectors were dangerous, negligently failed to inform its customers, including Lemkes, about the hazard involved in Cobra flexible connectors. The court also concluded that MUD was negligent in failing to inform its personnel about the Cobra flexible connectors and failing to instruct them to investigate for Cobra connectors while on the premises for a service call regarding a gas-fueled appliance. Additionally, the court found that Lemkes were not contributorily negligent and awarded damages to them: $800,991 to Lorraine for her personal injury and property loss and $180,875 to Kenneth for his property loss and the medical expenses which he paid on Lorraine's behalf.

## ASSIGNMENTS OF ERROR

MUD contends that the trial court erred in (1) failing to apply the discretionary function exemption of the Nebraska Political Subdivisions Tort Claims Act concerning MUD's conduct, (2) holding that MUD owed a duty to notify its customers concerning the hazard involved in a Cobra connector used for a gas appliance, (3) failing to find that Lemkes were contributorily negligent in a degree sufficient to bar recovery, and (4) awarding damages that were excessive or were unsupported by the evidence.

## DISCRETIONARY FUNCTION EXEMPTION

MUD contends that liability for Lemkes' damages is barred by the discretionary function exemption of the Political Subdivisions Tort Claims Act, § 13-910(2).

Whether undisputed facts demonstrate that liability is precluded by the discretionary function exemption of the Political Subdivisions Tort Claims Act is a question of law. See *Blitzkie v. State,* 241 Neb. 759, 491 N.W.2d 42 (1992).

"Regarding a question of law, an appellate court has an obligation to reach a conclusion independent from a trial court's conclusion in a judgment under review." *Huffman v. Huffman*, 232 Neb. 742, 748, 441 N.W.2d 899, 904 (1989). Accord, *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 783, 496 N.W.2d 902 (1993); *Sports Courts of Omaha v. Meginnis*, 242 Neb. 768, 497 N.W.2d 38 (1993); *Ehlers v. Perry*, 242 Neb. 208, 494 N.W.2d 325 (1993).

Performance or nonperformance of a discretionary function cannot be the basis for liability under the Political Subdivisions Tort Claims Act. See *Allen v. County of Lancaster*, 218 Neb. 163, 352 N.W.2d 883 (1984). Cf., *Security Inv. Co. v. State*, 231 Neb. 536, 437 N.W.2d 439 (1989) (discretionary function exemption of State Tort Claims Act, Neb. Rev. Stat. § 81-8,219(1)(a) (Reissue 1987)); *Wickersham v. State*, 218 Neb. 175, 354 N.W.2d 134 (1984).

Summarizing applicability of the discretionary function exemption of the State Tort Claims Act in *Security Inv. Co. v. State*, 231 Neb. at 546, 437 N.W.2d at 446, we stated:

> [W]e conclude that applicability of the discretionary function exception in the State Tort Claims Act depends on the conduct in question, not on the identity of the actor. . . . Judgment or choice is essential and indispensable for discretionary conduct excepted from negligence liability under the State Tort Claims Act. The discretionary function exception of the State Tort Claims Act protects or excepts only governmental decision, action, or conduct based on a permissible exercise of a public policy judgment. The discretionary function exception is inapplicable to a claim under the State Tort Claims Act if a statute, regulation, or policy specifically prescribes a course of governmental action or conduct.

Although the foregoing was expressed concerning the State Tort Claims Act, the preceding excerpt from *Security Inv. Co.* applies equally well to an interpretation of the identical language used for the discretionary function exemption stated in the Political Subdivisions Tort Claims Act.

As explained in *U.S. v. Gaubert*, 499 U.S. 315, 111 S. Ct. 1267, 1273-74, 113 L. Ed. 2d 335 (1991), concerning the

discretionary function exemption of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1988), which is substantially similar to the Political Subdivisions Tort Claims Act:

> [E]ven "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." [*Berkovitz v. United States*, 486 U.S. 531, 536, 108 S. Ct. 1954, 100 L. Ed. 2d 531 (1988)]. See [*United States v. Varig Airlines*, 467 U.S. 797, 813, 104 S. Ct. 2755, 81 L. Ed. 2d 660 (1984)]. Because the purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *id.*, at 814, 104 S.Ct., at 2765, when properly construed, the exception "protects only governmental actions and decisions based on considerations of public policy." *Berkovitz, supra*, at 537, 108 S.Ct., at 1959.

Applying an analysis similar to that used in *Gaubert*, recent federal decisions have concluded that a governmental decision not to warn concerning a danger which is known to the government but which is unknown to the public is not protected by the discretionary function exemption when the governmental decision does not involve the type of social, economic, or political policy judgment protected by the Federal Tort Claims Act. See, *Andrulonis v. U.S.*, 924 F.2d 1210 (2d Cir. 1991), *judgment vacated and case remanded sub nom. New York State Department of Health v. Andrulonis*, _____ U.S. _____, 112 S. Ct. 39, 116 L. Ed. 2d 18, *reconsidered and reinstated after remand* 952 F.2d 652 (absence of a governmental warning of the hazards associated with use of rabies viral strain was not a discretionary function because negligently withholding a warning did not involve a policy analysis); *Summers v. U.S.*, 894 F.2d 325 (9th Cir. 1990), *opinion amended and superseded by* 905 F.2d 1212 (National Park Service's failure to warn of potential danger of stepping on hot coals after fire rings were permitted on public beach was not a discretionary function because the decision did not involve balancing competing policy considerations); *Boyd v.*

*U.S. ex rel. U.S. Army, Corps of Engineers*, 881 F.2d 895 (10th Cir. 1989) (Army Corps of Engineers' failure to warn swimmers that boats were allowed in popular swimming area was not a discretionary function because decision did not involve social, economic, or political policy judgment); *Denham v. U.S.*, 834 F.2d 518 (5th Cir. 1987) (Army Corps of Engineers' failure to warn swimmers of submerged concrete anchors in a designated swimming area was not a discretionary act because such conduct was not the type that Congress intended to shield from tort liability); *George v. U.S.*, 735 F. Supp. 1524 (M.D. Ala. 1990) (Forest Service's decision to take no precautions despite knowledge of the presence of a large and aggressive alligator near a designated swimming area was not a discretionary act because the activity in question was not the type that Congress intended to shield from tort liability).

In *Blitzkie v. State*, 241 Neb. 759, 491 N.W.2d 42 (1992), we considered whether notifying veterinarians only concerning a pseudorabies outbreak in hogs vis-a-vis notice to individual owners of hogs in the affected area involved a discretionary function exempt from liability under the State Tort Claims Act. In rejecting the State's liability to an owner who was not notified concerning the hog disease, we stated: "The method of notice and to whom the notice would be sent were completely discretionary functions . . . ." 241 Neb. at 763, 491 N.W.2d at 45. Therefore, in *Blitzkie* we held that under the State Tort Claims Act, the State's decision concerning the method for warning about a danger was a discretionary function, but we did not address and, therefore, we did not decide whether a governmental decision not to warn is always a discretionary function. Cf. *Wickersham v. State*, 218 Neb. 175, 354 N.W.2d 134 (1984) (state's department of agriculture had a nondiscretionary duty to notify a rancher concerning a detected cattle disease when state or federal regulations required such notice).

State courts have considered whether governmental failure to warn of a dangerous condition known to the government but unknown to the public is a discretionary function. For instance, in *City of St. Petersburg v. Collom*, 419 So. 2d 1082 (Fla. 1982), the Florida Supreme Court considered the negligence claim of

an individual whose wife and daughter drowned after stepping into a city storm sewer which was not readily apparent. Noting that the storm sewer was, in effect, a hidden trap, the court stated:

> [W]hen a governmental entity creates a *known* dangerous condition, which is not readily apparent to persons who could be injured by the condition, a duty at the operational-level arises to warn the public of, or protect the public from, the known danger. The failure to fulfill this operational-level duty is, therefore, a basis for an action against the governmental entity.

(Emphasis in original.) 419 So. 2d at 1083. A similar rationale was applied in *Department of Transp. v. Neilson*, 419 So. 2d 1071 (Fla. 1982), wherein the plaintiff alleged that the city negligently designed an intersection and failed to install adequate traffic control devices. Acknowledging that in a majority of jurisdictions, the discretionary function exemption protects a governmental decision in planning installation of particular traffic control devices, the Florida Supreme Court stated:

> With regard to the installation and placement of traffic control devices, we find the argument that such placement is exclusively the decision of traffic engineers and, as such, an operational-level function, to be without merit. . . . In our view, decisions relating to the installation of appropriate traffic control methods and devices or the establishment of speed limits are discretionary decisions which implement the entity's police power and are judgmental, planning-level functions.

> We also hold that the decision to build or change a road, and all the determinations inherent in such a decision, are of the judgmental, planning-level type. . . . The fact that a road is built with a sharp curve is not in itself a design defect which creates governmental liability. If, however, the governmental entity knows when it creates a curve that vehicles cannot safely negotiate the curve at speeds of more than twenty-five miles per hour, such entity must take steps to warn the public of the danger.

> The failure to so warn of a known danger is, in our

view, a negligent omission at the operational level of government and cannot reasonably be argued to be within the judgmental, planning-level sphere. Clearly, this type of failure may serve as the basis for an action against the governmental entity.

419 So. 2d at 1077-78.

Courts in states other than Florida have also held that a governmental decision not to warn the public against a governmentally caused and latent dangerous condition is not a discretionary act. See *Miller v. Grants Pass Irrigation*, 297 Or. 312, 320, 686 P.2d 324, 329 (1984): "If there is a legal duty to protect the public by warning of a danger or by taking preventing measures, or both, the choice of means may be discretionary, but the decision whether or not to do so at all is, by definition, not discretionary." See, also, *Socorro v. Orleans Levee Bd.*, 561 So. 2d 739 (La. App. 1990), *affirmed in part and in part reversed on other grounds sub nom. Socorro v. City of New Orleans*, 579 So. 2d 931 (La. 1991) (city's failure to warn against the danger from submerged rocks in a public diving area, when the city knew or should have known about the danger, was not policymaking or a discretionary decision).

Therefore, we hold that when (1) a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity and (2) the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by the dangerous condition or hazard, the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard. In such a situation, a governmental entity's failure to warn or take other protective measures is not a planning-level decision involving a social, economic, or political policy judgment and, therefore, does not come within the discretionary function exemption of the Political Subdivisions Tort Claims Act.

Although there is no evidence that MUD installed the Cobra connector to Lemkes' gas range, it is undisputed that MUD installed thousands of Cobra connectors for customers' gas appliances. The 1980 AGA directory and AGA's directories

published semiannually between 1980 and the date of the explosion at Lemkes' house supplied notice to MUD that a serious problem existed as the result of deterioration in Cobra connectors, namely, "the [brazed] joint could break allowing escape of gas." When MUD received information about the dangerous condition or potential hazard involving Cobra connectors but did not disseminate this critical information to its customers who were using gas appliances with Cobra connectors, MUD effectively exerted control in a situation that could eventually culminate in injury to customers who continued to use gas supplied by MUD. Moreover, we believe that MUD's failure to warn its customers can hardly be characterized as a decision based on a legitimate social, economic, or political policy judgment. At best, MUD's conduct might be classified as a decision by default inasmuch as nothing indicates that MUD ever decided to refrain from warning its customers; rather, the absence of a warning resulted from inactivity attributable to an internal lack of knowledge on the part of MUD's personnel at any level or indifference to the warning which MUD had received from AGA. Consequently, in Lemkes' case, the discretionary function exemption under the Political Subdivisions Tort Claims Act is unavailable to MUD.

## MUD'S DUTY

MUD contends that it had no duty to notify its customers concerning a potential hazard from Cobra connectors, especially a customer who may not have purchased the connector from MUD.

"For actionable negligence there must be a defendant's legal duty to protect the plaintiff from injury, a failure to discharge that duty, and damage resulting from such undischarged duty. [Citations omitted.]

" ' "Duty" is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in the light of the apparent risk. . . .

" 'A duty, in negligence cases, may be defined as an

obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' Prosser and Keeton on the Law of Torts, *Limited Duty* § 53 at 356 (5th ed. 1984).

"Foreseeability is a factor in establishing a defendant's duty, or, as expressed by Justice Cardozo in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 394, 111 N.E. 1050, 1054 (1916): '[F]oresight of the consequences involves the creation of a duty . . . .' . . ."

*Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 172-73, 425 N.W.2d 872, 881 (1988) (quoting *Holden v. Urban*, 224 Neb. 472, 398 N.W.2d 699 (1987)). Accord *Parrish v. Omaha Pub. Power Dist.*, 242 Neb. 783, 496 N.W.2d 902 (1993). "The question whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular situation." 242 Neb. at 792, 496 N.W.2d at 909.

On several occasions, this court has considered the duty of care which a natural gas supplier owes to its customers. As we stated in *Clay v. Butane Gas Corporation*, 151 Neb. 876, 890, 39 N.W.2d 813, 821 (1949):

"Natural gas is a dangerous agency. Its distribution is accompanied by many possible dangerous consequences, and it is therefore well established that a higher degree of care and vigilance is required in dealing with such agency than is required in the ordinary affairs of life. A degree of care commensurate to the danger involved is required of a distributor of natural gas to avoid injury and damage and, in case of failure to exercise such care, and [in case] injury results, it is liable." Koch v. Southern Cities Distributing Co., 18 La. App. 664, 138 So. 178 [(1931)].

In other cases we have held that a gas company must exercise a degree of care commensurate with the hazards of natural gas as a dangerous commodity. See, *Hammond v. The Nebraska Nat. Gas Co.*, 204 Neb. 80, 281 N.W.2d 520 (1979) (natural gas is a dangerous commodity; therefore, a gas company must use a high degree of care to prevent injury from gas escaping from the company's lines); *Whittington v. Nebraska Nat. Gas Co.*, 177 Neb. 264, 128 N.W.2d 795 (1964) (a gas company owes a duty to

its customers to exercise a degree of care commensurate with the danger in its gas business); *Reed v. Metropolitan Utilities Dist.*, 173 Neb. 854, 115 N.W.2d 453 (1962) (a gas company must exercise a high degree of care and diligence in handling natural gas as a dangerous commodity). See, also, *Daugherty v. Nebraska Nat. Gas Co.*, 173 Neb. 30, 112 N.W.2d 790 (1961); *Fonda v. Northwestern Public Service Co.*, 134 Neb. 430, 278 N.W. 836 (1938).

In *Mattson v. Central Electric & Gas Co.*, 174 F.2d 215 (8th Cir. 1949), a school janitor was killed by an explosion of natural gas leaking from a deteriorated service line to the school. The gas company asserted that it owed no duty to maintain the service line owned by the school district. However, the U.S. Court of Appeals for the Eighth Circuit, applying Nebraska law, stated:

> Under the Nebraska decisions the Gas Company could not delegate the duty it owed to the public to exercise proper care to maintain its gas system in a safe condition, but it had the continuing duty to exercise proper care to prevent injury from escaping gas. Hence, the mere fact that the service pipe was paid for and possibly was the property of the consumer, did not shift the duty of exercising proper care. The gas in the service pipe, as before noted, was that of the defendant, and as long as it remained its property it was under the duty of using proper care to protect the public from injury caused by the dangerous propensities of that property. A proper regard for the safety of the public would seem to forbid the owner of such a dangerous agency to avoid liability for damage by simply housing such property in a container belonging to some one else, particularly when the owner of such dangerous agency knows, or is charged with knowledge, that the housing or container facilities are in a decayed, dilapidated and deteriorated condition.

174 F.2d at 222.

The *Mattson* rationale was adopted as the law of Nebraska in *Daugherty v. Nebraska Nat. Gas Co., supra*, in which this court, referring to and quoting extensively from the *Mattson* decision and its exposition of Nebraska law, stated: "[W]e

accept the conclusions of [the *Mattson*] court as our own." 173 Neb. at 33, 112 N.W.2d at 793. Hence, on account of the inherent and substantial danger of natural gas, a gas distribution company has a nondelegable duty to exercise due care in the distribution of natural gas. See, *Hammond v. The Nebraska Nat. Gas Co., supra*; *Whittington v. Nebraska Nat. Gas Co., supra*; *Daugherty v. Nebraska Nat. Gas Co., supra*.

In *Clay v. Butane Gas Corporation*, 151 Neb. at 891, 39 N.W.2d at 821, this court stated:

> While liability of a distributor of gas does not attach, in the absence of a reasonable basis for anticipating danger, that fact does not relieve the distributor from such diligent and adequate inspection of its transportation and service facilities where the reasonable basis to anticipate danger actually exists. [Citation omitted.]
>
> Where a gas company is cognizant of facts which should indicate to it the possibility of accident it may be held liable even though the precise manner in which the harm resulted could not have been foreseen. [Citations omitted.]

Also, as this court expressed in *Clough v. North Central Gas Co.*, 150 Neb. 418, 433, 34 N.W.2d 862, 871 (1948) (quoting *Stephany v. Equit. Gas Co.*, 347 Pa. 110, 31 A.2d 523 (1943)): " 'The responsibility of the gas company arises from knowledge of a dangerous condition and not by reason of the condition.' " Because a gas company has a nondelegable duty to exercise due care regarding natural gas supplied to a customer, a gas company's duty of care not only pertains to the company's distribution of gas through its pipelines, but extends to distribution through a customer's service line or gas appliance that the company knows, or should know, is unsafe for conducting or using gas. See, *Clough v. North Central Gas Co., supra*; *Mattson v. Central Electric & Gas Co., supra*. See, also, *Halliburton v. Public Service Co.*, 804 P.2d 213 (Colo. App. 1990) (gas company which knew of potentially dangerous flexible connectors in its customers' homes had a duty to take corrective action, including a duty to warn). Thus, despite a gas company's nondelegable duty, the company is not liable for injuries from distribution of natural gas if the company has

neither knowledge nor the opportunity to learn through reasonable diligence that a dangerous condition exists in the system used for distribution of its gas.

In view of industrywide "corrosion cracking" in joints with Cobra connectors, AGA warned all its members, including MUD, that Cobra connectors presented a very real danger in the distribution of natural gas. The information which MUD received from AGA placed MUD on notice that its customers who had gas appliances with Cobra connectors would be endangered when the connector separated from a gas service line or appliance. Consequently, when MUD became aware that the distribution of gas through a Cobra connector presented a risk of injury to customers, MUD had the duty to use due care, such as issuance of a warning, to protect customers during its distribution of natural gas through its own system and through a customer's service line for a gas appliance. When MUD's service personnel worked on gas appliances in Lemkes' house and even adjusted some of the Lemke gas ranges in 1986, those service personnel could easily have checked to ascertain whether a Cobra connector linked the gas service line and the range, if the service personnel had been informed about the problem with the Cobra connectors and had been instructed to inspect for presence of the troublesome connectors. Equipped with information about Cobra connectors, MUD's service personnel could have called the problem to a customer's attention, and corrective or preventative action might have been taken. Such a course of action was apparently quite feasible, at least according to MUD's witnesses. Also, bill stuffers and newspaper messages might have been means to inform customers concerning possible problems from flexible metal connectors. However, MUD relegated the AGA information to MUD's engineering library instead of communicating the crucial information to MUD's customers. Thus, MUD failed to warn its customers concerning the dangerous condition and hazard posed by Cobra connectors used in the continuing distribution of gas for customers' appliances. Under the circumstances, the district court correctly concluded that MUD had a duty to warn its customers concerning natural gas conducted through a Cobra connector,

but negligently breached that duty to Lemkes as customers.

## CONTRIBUTORY NEGLIGENCE

MUD asserts that Lemkes' contributory negligence was more than slight in comparison with MUD's negligence, and therefore, Lemkes are barred from a recovery. See Neb. Rev. Stat. § 25-21,185 (Reissue 1989).

> A plaintiff is contributorily negligent if (1) the plaintiff fails to protect himself or herself from injury; (2) the plaintiff's conduct concurs and cooperates with the defendant's actionable negligence; and (3) the plaintiff's conduct contributes to the plaintiff's injuries as a proximate cause.

*Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 850, 438 N.W.2d 485, 490 (1989). Accord, *Ditloff v. Otto*, 239 Neb. 377, 476 N.W.2d 675 (1991); *Sikyta v. Arrow Stage Lines*, 238 Neb. 289, 470 N.W.2d 724 (1991); *Jensen v. Archbishop Bergan Mercy Hosp.*, 236 Neb. 1, 459 N.W.2d 178 (1990).

A defendant has the burden of proving the affirmative defense of contributory negligence. See, *Jensen v. Archbishop Bergan Mercy Hosp., supra*; *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 403 N.W.2d 335 (1987).

> Contributory negligence must always be examined in the light of the particular facts in each case. The duty to make this examination and determination concerning contributory negligence properly belongs to the fact finder unless the evidence compels only one conclusion about which reasonable [persons] cannot disagree.

*Ditloff v. Otto*, 239 Neb. at 385, 476 N.W.2d at 680. See, also, *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987).

Although an odor of natural gas was present on the morning of the explosion, Lorraine Lemke attempted to relight the gas range's pilot light in the manner which she had previously used when the pilot light had gone out. Moreover, the method used by Lorraine in attempting to relight the range's pilot conformed to the method suggested in MUD's "scratch and sniff" brochure and the newspaper message that "a slight odor near a gas appliance may mean a pilot light needs relighting, and most

people can do that." It is somewhat difficult to characterize Lorraine Lemke's actions as contributory negligence when her conduct was patterned on MUD's expressly suggested direction and approval for relighting a pilot.

On our examination of the record, we cannot conclude that Lorraine Lemke was guilty of negligence as a matter of law and as a bar to recovery. The factual question of contributory negligence was considered by the district court and was answered in favor of Lemkes. Consequently, MUD's assignment of error based on Lemkes' contributory negligence is without merit.

## DAMAGES

In its final assignment of error, MUD maintains that the awarded damages are excessive or are unsupported by the evidence.

"A verdict will not be set aside on appeal unless it is so clearly exorbitant as to indicate that it was the result of passion, prejudice, or mistake, or it is clear that the trier of fact disregarded the evidence or rules of law." *Rahmig v. Mosley Machinery Co.*, 226 Neb. at 457, 412 N.W.2d at 78. See, also, *Williams v. Monarch Transp.*, 238 Neb. 354, 470 N.W.2d 751 (1991). The foregoing rule of law is also applicable to a court's award of damages in a negligence action brought under the Political Subdivisions Tort Claims Act.

Evidence in the Lemke case supports the district court's finding that Lemkes had been damaged as a result of the explosion and fire. "Lemkes' Losses," previously mentioned in this opinion, dispels any notion that the district court awarded excessive damages to Lemkes.

## CONCLUSION

The district court's judgments for Lemkes are affirmed.

AFFIRMED.