Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/16/2021 09:09 AM CDT

Mark Mercer, individually, et al., appellees, and
Columbia National Insurance Company, a Nebraska
corporation, and Farmers Mutual Insurance Company
of Nebraska, a Nebraska mutual insurance company,
intervenors-appellees, v. North Central Service, Inc.,
a Minnesota corporation, et al., appellees, and
Metropolitan Utilities District, a political
subdivision, appellant.

M's, Inc., a Nebraska corporation, doing business
as M's Pub, appellee, and United Fire & Casualty
Company, as subrogee for M's, Inc., a Nebraska
corporation, intervenor-appellee, v.
Metropolitan Utilities District,
a political subdivision,
appellant.

Columbia National Insurance Company, as subrogee
for Old Omaha Association, appellee, v.
Metropolitan Utilities District, a
political subdivision, appellant.

Nouvelle Eve, Inc., a Nebraska corporation, and
Susanne Keuck, an individual, appellees, and
Truck Insurance Exchange, as subrogee for
Nouvelle Eve, Inc., a Nebraska corporation,
intervenor-appellee, v. Metropolitan
Utilities District, a political
subdivision, appellant.

___ N.W.2d ___

Filed January 22, 2021.    Nos. S-20-193, S-20-196, S-20-198, S-20-205.

1. **Political Subdivisions Tort Claims Act: Appeal and Error.** Whether a plaintiff's negligence claims are precluded by an exception to the Political Subdivisions Tort Claims Act is a question of law for which an appellate court has a duty to reach its conclusions independent of the conclusions reached by the district court.

2. **Summary Judgment: Appeal and Error.** An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.

3. **Political Subdivisions Tort Claims Act.** The purpose of the discretionary function exception to the Political Subdivisions Tort Claims Act is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.

4. ____. The discretionary function exception to the Political Subdivisions Tort Claims Act extends only to basic policy decisions made in governmental activity, and not to ministerial activities implementing such policy decisions. The exception does not extend to the exercise of discretionary acts at an operational level. Examples of discretionary functions include the initiation of programs and activities, establishment of plans and schedules, and judgmental decisions within a broad regulatory framework lacking specific standards.

5. ____. A court engages in a two-step analysis to determine whether the discretionary function exception to the Political Subdivisions Tort Claims Act applies. First, the court must consider whether the action is a matter of choice for the acting employee. If the court concludes that the challenged conduct involves an element of judgment, it must then determine whether that judgment is of the kind that the discretionary function exception was designed to shield.

6. **Political Subdivisions Tort Claims Act: Governmental Subdivisions: Notice: Negligence.** When (1) a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity and (2) the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by the dangerous condition or hazard, the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard. In such a situation, a governmental entity's failure to warn or take other protective measures is not a planning-level decision involving a social, economic, or political policy judgment and, therefore, does not come within the discretionary function exception of the Political Subdivisions Tort Claims Act.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Michael F. Coyle, Robert W. Futhey, and Daniel J. Gutman, of Fraser Stryker, P.C., L.L.O., and Mark A. Mendenhall, of Metropolitan Utilities District, for appellant.

Anne Marie O'Brien and Michael L. Storey, of Lamson, Dugan & Murray, L.L.P., for appellees Mark Mercer et al.

Matthew B. Reilly and Thomas J. Culhane, of Erickson & Sederstrom, P.C., L.L.O., for intervenors-appellees Columbia National Insurance Company and Farmers Mutual Insurance Company.

Thomas M. White and Amy S. Jorgensen, of White & Jorgensen, and Richard A. DeWitt and Robert M. Gonderinger, of Coker, Huck, Kasher, DeWitt, Anderson & Gonderinger, L.L.C., for appellee M's, Inc.

Brian T. Bailey, of Nielsen, Zehe & Antas, P.C., for appellee United Fire & Casualty Company.

Edward F. Pohren and Jerry M. Slusky, of Smith, Slusky, Pohren & Rogers, L.L.P., for appellees Nouvelle Eve, Inc., and Susanne Keuck.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

HEAVICAN, C.J.

## INTRODUCTION

An explosion and fire destroyed part of the Old Market area in Omaha, Nebraska. Various affected landowners and their insurers brought suit against a fiber optic contractor, a wireless company, and the Metropolitan Utilities District (MUD). The plaintiffs settled with all defendants except MUD. MUD sought summary judgment, arguing that it was immune from suit. The district court found that MUD was not immune

from suit and denied MUD's motion for summary judgment. MUD appeals. We affirm.

## BACKGROUND

*Gas Explosion and Fire.*

On January 9, 2016, at 2:50 p.m., an explosion and fire occurred in the Old Market area of Omaha. The natural gas explosion occurred in the basement of the Mercer Building, located at the corner of 11th and Howard Streets and owned by plaintiffs, Mark Mercer and Vera Mercer, who also resided in the building. The building's ground floor housed two businesses, Nouvelle Eve, Inc., a clothing boutique, and M's Pub, a restaurant.

MUD was, at all relevant times, a member of a statewide one-call notification center (Nebraska One-Call), also known as Nebraska811.[1] MUD contributed to the costs of Nebraska One-Call and provided MUD facility location information when requested. In addition to definitions and requirements as set out in statute, the Nebraska One-Call board of directors maintains an excavator manual, which is distributed to excavators intending to excavate in Nebraska. That manual was entered into evidence. Also offered into evidence was MUD's locating manual.

On December 10, 2015, according to evidence offered at the summary judgment hearing, Chris Sacco, an MUD locator, responded to a locate request "refresh" ticket made under Nebraska One-Call by North Central Service, Inc. (NCS), for the area in front of the Mercer Building. NCS planned to use horizontal directional drilling (HDD) to bore an underground path for fiber optic cable. HDD is often referred to as "blind drilling." It creates a risk of striking an object below the surface of the ground that is not seen by the drill operator. There is evidence in the record that natural gas pipe strikes as a result of HDD are common.

---

[1] See Neb. Rev. Stat. § 76-2301 et seq. (Reissue 2009 & Cum. Supp. 2016).

Sacco spoke with NCS' foreman and walked the bore path with him. After walking the path, Sacco used MUD resources to ascertain where the shutoff valve for the relevant gas line was located. According to Sacco's deposition, once he had determined the coordinates of the gas line in question and measured out those coordinates, he placed a dot of yellow paint on the curb in front of M's Pub marking where the gas line entered the building.

Sacco testified that he then crossed 11th Street and found the gas service valve cover, but it was located under a parked car. Because he could not open the cover, Sacco could not electronically locate the distribution line. Instead, Sacco visually lined a traffic cone with the dot he had made in front of M's Pub, and he then placed a second dot on the sidewalk in front of M's Pub to mark where the gas line was in the bore path. There is also evidence supporting a finding that Sacco made a third mark in the street.

In addition to allegedly marking the line with dots, Sacco found the "stop box" for the gas line into the Mercer Building that had been abandoned in 2009. The stop box was next to the yellow dot that Sacco said he placed by the curb in front of M's Pub. Based on the research he had just done to find the coordinates of the gas line, Sacco knew that this box was abandoned. Sacco testified that although he had a responsibility to tell his supervisor that the box had not been properly abandoned, he did not do so.

Sacco testified that he used dots and not lines because he did not want paint to drift onto M's Pub customers who were seated outside. Other evidence suggested that at this time of year, the outdoor seating area was not open, and that thus, in the words of an owner of M's Pub, there was "[n]ot a chance" diners were seated outside.

A report completed by the State Fire Marshal following an investigation into the fire opined that the dots found on the sidewalk in front of M's Pub had not been recently marked when contrasted with brighter yellow markings across the street. Evidence about the relative brightness of the blue

paint marking the water lines that were laid by a different locator working with Sacco on December 10, 2015, was also offered to shed doubt on Sacco's assertion that he located and marked the relevant gas lines on December 10.

On January 4, 2016, Ron Jankowski, a second MUD locator, was assigned another "refresh" ticket for the sidewalk in front of the Mercer Building. Jankowski spoke to the NCS foreman, who informed him that he was fine with the markings in the Old Market area and that MUD did not need to re-mark the area. Jankowski completed the remainder of the refresh tickets and then decided to drive through the Old Market to satisfy himself that marks for water and gas were painted in front of the building. Jankowski testified that he drove south down 11th Street, at between 10 and 15 miles per hour, and saw marks for water and gas painted in front of M's Pub, though he did not see the yellow-marked gas valve cover.

On January 9, 2016, NCS began working just outside the Mercer Building. According to the record, NCS employees were aware of a gas line on the east side of 11th Street because it was marked with long yellow lines. According to the testimony of those involved, the area was searched for yellow markings, which were seen in the alley and on the east side of the street. According to deposition testimony, no yellow markings were found on the west side of 11th Street where the HDD was to be done in front of the Mercer Building.

While performing HDD, NCS struck the gas line in front of the Mercer Building. Gas escaped from the ruptured line and migrated to the basement of the building, where it encountered an ignition source and exploded. Notification of the fire was received by the 911 emergency dispatch service at 2:51 p.m. The Omaha Fire Department (OFD) and MUD were, in turn, notified. Upon arriving at the fire, an OFD representative determined that the fire was gas fed and that MUD was needed to turn off the gas.

Upon receiving notification of the fire, an MUD dispatcher radioed Al Kurz, an MUD field services technician,

at 2:53 p.m. Kurz was in the midst of a job and indicated that he would go to the fire when he was finished. The dispatcher took a second call from 911 at 2:55 p.m., when OFD concluded that gas was involved. The dispatcher updated Kurz at 2:56 p.m., then notified a senior MUD technician, Steve Osmera, who indicated he would report to the scene. Osmera then accessed the location of the gas line into the Mercer Building.

Having accessed the location and written down the coordinates, Osmera headed to the Old Market. But when he arrived there at 3:16 p.m., he was immediately summoned to speak to the OFD chief and left the paper with the coordinates in his vehicle. Osmera surveyed the scene and determined that a "grade one leak" had occurred, which is the most serious type of gas leak. He called dispatch at 3:17 p.m. so that other MUD personnel could be dispatched. At that time, Osmera was informed that an MUD foreman with authorization to turn off gas transmission main lines was on his way.

While walking the scene, Osmera saw a yellow-painted "stop box" in the sidewalk outside of M's Pub. A stop box, or curb box, is an outside shutoff for a service used on a sidewalk. Osmera, believing that this was the valve to shut off gas service into the Mercer Building, moved to open the box and turn off the gas. As he sought out tools to do so, he encountered Kurz.

Kurz had arrived at the scene at 3:21 p.m. His assistant remained in their vehicle to look up the coordinates of the gas distribution valve into the Mercer Building. When Osmera saw Kurz arrive, he asked Kurz to help him turn off the valve he had located on the sidewalk. Kurz' assistant followed Osmera to help. The three eventually got the valve into the off position, but the flames did not abate. At 3:31 p.m. Osmera notified dispatch that the valve was turned off but it did not "kill the flames." Osmera then began looking on a computer for other valves for gas lines in the alley, but apparently, he did not look for other valves on 11th Street.

About 1 hour later, MUD employees were walking around the area and noticed two "CC box[es]" in the street. A CC box is similar to a stop box or curb box, except it is made of heavier material for placement in the street. One CC box was marked "GAS." The employees got the attention of Kurz and an OFD firefighter. Not waiting for MUD tools, the firefighter used a pick to open the CC box. Kurz was then able to turn off the gas at 4:26 p.m., about 1½ hours after MUD was first notified of the fire. At that point, the fire in the stairwell at M's Pub was extinguished.

Evidence showed that due to the danger in a fire fed by gas, OFD was not able to take an offensive position in fighting the fire until the gas had been turned off. So as MUD sought out the correct valve, OFD continued in a defensive position with respect to the fire, attempting to keep it from moving to surrounding buildings.

*Procedural History.*

Multiple lawsuits were initiated in Douglas County as a result of the damage caused by this fire. Plaintiffs in those cases filed suit, and numerous insurance companies intervened, alleging negligence as to multiple defendants. Due to various settlements, MUD is the only remaining defendant involved in these appeals. The plaintiffs' allegations generally center on three failures by MUD: (1) failing to properly mark the gas line, (2) failing to timely shut off the gas at the scene of the fire, and (3) failing to properly abandon the old gas line outside the Mercer Building.

MUD filed a motion to dismiss in each case on the ground that it was immune from suit on the basis of the discretionary function exception to the Political Subdivisions Tort Claims Act (PSTCA).[2] That motion was denied by the district court, which concluded that it was "unable to determine, from the face of the challenged complaints, whether the alleged

---

[2] Neb. Rev. Stat. § 13-910(2) (Reissue 2012).

negligence involved discretionary policy-level decision-making or operational-level conduct." Thereafter, MUD filed several motions for summary judgment. As relevant to these appeals, the parties offered evidence with respect to MUD's claim of immunity.

Following a hearing, the district court denied MUD's motions for summary judgment. As is relevant on appeal, the district court reasoned that

> both the statute and MUD's own policies provide detailed instructions for employees on how facilities are to be located, marked, and documented, thereby eliminating any discretion.
>
>  . . . To the extent MUD argues that the locators exercised their judgment in how and where to mark the gas line at issue, the Court finds this was a "discretionary act at an operational level, where there is no room for policy judgment" to which the discretionary exception does not apply.

The court continued that "[e]ven if the Court determined that MUD did have an element of judgment in how its employees located, marked, [and] documented its facilities, as well as how it handled abandoned gas lines, the Court finds these actions are not the kind that the discretionary function was designed to shield . . . ."

MUD appeals.

## ASSIGNMENTS OF ERROR

MUD assigns, in all four appeals, that the district court erred in denying its motion for summary judgment on the basis of immunity under the discretionary function exception to the PSTCA[3].

## STANDARD OF REVIEW

[1] Whether a plaintiff's negligence claims are precluded by an exception to the PSTCA is a question of law for which

---

[3] See *id.*

an appellate court has a duty to reach its conclusions independent of the conclusions reached by the district court.[4]

[2] An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor.[5]

## ANALYSIS

*Jurisdictional Note.*

As an initial note, we have jurisdiction over this appeal under Neb. Rev. Stat. § 25-1902(1)(d) (Supp. 2019). That section includes, in the definition of a final order from which an appeal may be taken, "[a]n order denying a motion for summary judgment when such motion is based on the assertion of sovereign immunity or the immunity of a government official."[6]

*Immunity.*

The primary issues presented by this appeal are whether MUD is immune from suit as to its prefire actions in locating the relevant gas lines and in failing to abandon a gas line that previously serviced the Mercer Building, and also as to its postfire actions related to turning off the gas line servicing the Mercer Building. The district court denied MUD's motion for summary judgment, in which MUD had argued that it was immune from suit under the discretionary function exception to the PSTCA.

For the reasons set forth below, we affirm the decision of the district court. In so affirming, we note that the sole issue presented to this court on appeal is whether MUD was entitled to immunity from suit, and accordingly, this court considers the facts only to the extent it is necessary to determine

---

[4] See *Amend v. Nebraska Pub. Serv. Comm.*, 298 Neb. 617, 905 N.W.2d 551 (2018).

[5] *Kaiser v. Allstate Indemnity Co.*, 307 Neb. 562, 949 N.W.2d 787 (2020).

[6] § 25-1902(1)(d).

whether the allegations against MUD were protected by the discretionary function exception to the PSTCA. We are not presented with, nor do we opine upon, the merits of the underlying litigation.

The PSTCA operates to waive the immunity of political subdivisions, but is subject to exceptions as set forth in § 13-910. Section 13-910(2) provides that the PSTCA does not apply to "[a]ny claim based upon the exercise or performance of or the failure to exercise or perform a discretionary function or duty on the part of the political subdivision or an employee of the political subdivision, whether or not the discretion is abused."

[3,4] The purpose of the discretionary function exception is to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.[7] The discretionary function exception extends only to basic policy decisions made in governmental activity, and not to ministerial activities implementing such policy decisions. The exception does not extend to the exercise of discretionary acts at an operational level.[8] Examples of discretionary functions include the initiation of programs and activities, establishment of plans and schedules, and judgmental decisions within a broad regulatory framework lacking specific standards.[9]

[5] A court engages in a two-step analysis to determine whether the discretionary function exception to the PSTCA applies.[10] First, the court must consider whether the action is a matter of choice for the acting employee.[11] If the court concludes that the challenged conduct involves an element of judgment, it must then determine whether that judgment

---

[7] *Kimminau v. City of Hastings*, 291 Neb. 133, 864 N.W.2d 399 (2015).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

is of the kind that the discretionary function exception was designed to shield.[12]

[6] But when (1) a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity and (2) the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by the dangerous condition or hazard, the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard.[13] In such a situation, a governmental entity's failure to warn or take other protective measures is not a planning-level decision involving a social, economic, or political policy judgment and, therefore, does not come within the discretionary function exception of the PSTCA.[14]

The One-Call Notification System Act is relevant to the nature of MUD's assertion of immunity. The intent of the One-Call Notification System Act is

> to establish a means by which excavators may notify operators of underground facilities in an excavation area so that operators have the opportunity to identify and locate the underground facilities prior to excavation and so that the excavators may then observe proper precautions to safeguard the underground facilities from damage.[15]

Moreover, "[i]t is the purpose of the One-Call Notification System Act to aid the public by preventing injury to persons and damage to property and the interruption of utility services resulting from accidents caused by damage to underground facilities."[16]

---

[12] *Id.*

[13] *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993).

[14] *Id.*

[15] § 76-2302(1).

[16] § 76-2302(2).

In order to accomplish this purpose, the participating utilities must comply with § 76-2323:

> (1) Upon receipt of the information contained in the notice pursuant to section 76-2321, an operator shall advise the excavator of the approximate location of underground facilities in the area of the proposed excavation by marking or identifying the location of the underground facilities with stakes, flags, paint, or any other clearly identifiable marking or reference point . . . .

This court has previously discussed what qualifies as a discretionary function for purposes of that exception to the PSTCA. Recently, in *Lambert v. Lincoln Public Schools*,[17] we concluded that the decision to enforce an elementary school's "no dogs" policy only during the schoolday was a discretionary function and that the school district was immune from suit under the PSTCA when it did not supervise a school playground after school hours. We reasoned that school administrators were given broad discretion to place restrictions on the use of school buildings and grounds, and also in utilizing staff to supervise school grounds, because such decisions were grounded in social, economic, and political policy.[18]

Conversely, in *Kimminau v. City of Hastings*,[19] we held that the failure to remove corn mash from the side of the road was not protected from liability by virtue of the discretionary function exception to the PSTCA. We noted that the maintenance of roads and highways was not a matter of choice, but was required under state law. We reasoned that specific actions to undertake a duty to maintain the roads were not policy decisions, but were ministerial acts at the operational level pursuant to the statutory duty to maintain roads, and thus were not immune under the discretionary function exception to the PSTCA.

---

[17] *Lambert v. Lincoln Public Schools*, 306 Neb. 192, 945 N.W.2d 84 (2020).

[18] *Id*.

[19] *Kimminau v. City of Hastings, supra* note 7.

In *Lemke v. Metropolitan Utilities Dist.*,[20] we found that the discretionary function exception was not applicable and that MUD had a nondiscretionary duty to warn its customers that a flexible natural gas connector linking their range to a gas line was defective, even if MUD did not provide the connector. We observed that the failure to warn in the instance where the governmental entity had notice of a dangerous condition and the dangerous condition was not readily apparent was not a planning-level decision involving a social, economic, or political policy judgment falling within the discretionary function exception.

*Marking of Gas Line.*

We turn first to whether the marking of the gas lines in question was a matter of choice for the MUD locators. We conclude that it was not. Section 76-2323 is clear that MUD and Nebraska One-Call's other members have a duty to "advise the excavator of the approximate location of underground facilities in the area of the proposed excavation by marking or identifying the location of the underground facilities with stakes, flags, paint, or any other clearly identifiable marking or reference point." MUD's own locating manual also emphasizes this necessity.

Our decision in *Lemke* informs of this duty. There, we considered whether MUD had a nondiscretionary duty to warn, considering first, whether it had actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity, and second, whether the dangerous condition or hazard was readily apparent to persons who are likely to be injured by the dangerous condition or hazard.[21]

MUD argues that the HDD was the dangerous condition or hazard and that because it was being performed by NCS, it was not under MUD's control. We disagree. While HDD is

---

[20] *Lemke v. Metropolitan Utilities Dist., supra* note 13.

[21] *Id.*

undoubtedly a dangerous activity, any danger was a result of the potential for striking buried utility lines. Those lines are under MUD's sole control. The record demonstrates that the buried gas lines servicing the Mercer Building were known to MUD and were under MUD's control but, because of their buried nature, were not readily apparent to the excavators who eventually struck the lines.

While we agree that some discretion is given to MUD in how these lines are marked, there is no discretion—as set forth by the applicable state statutes, the excavator manual, MUD's own locating manual, and the test set forth in *Lemke*—with respect to the ultimate responsibility to mark the lines. As such, MUD's marking of the lines was not a matter of choice for purposes of the discretionary function exception.

To the extent that there was discretion given to MUD locators as to the method of marking used by MUD, such discretion is not of the social, economic, or political policy that the discretionary function exception was designed to protect. Rather, the method the MUD locator used to mark the gas lines in question is the type of operational discretion not protected by the discretionary function exception.

*Gas Shutoff.*

We conclude the same as to allegations that MUD failed to timely shut off the gas and to properly abandon the out-of-service gas line outside of the Mercer Building.

MUD's own gas emergency procedure requires MUD to respond to emergencies and, upon request, shut off the natural gas; one MUD employee testified in a deposition that in responding to a gas fire, the number one priority is to shut off the gas "as quickly as possible." The exercise of this action was not a matter of choice.

We note MUD contends that while at the fire, its employees were acting in emergency conditions and their actions should be reviewed in light of those conditions. MUD takes issue with the appellees' listing of all of MUD's perceived wrongs at the scene and suggests that those are the types of

discretionary acts made in an emergency that should not be second-guessed.

But we read the appellees' primary assertion to be that MUD had a duty to turn off the gas as soon as possible and that as a result of its various deficiencies at the scene, MUD failed to do so. Regardless of the emergency—indeed because of the emergency—for purposes of the discretionary function exception, MUD had no choice as to whether it needed to turn off the gas in a timely manner. As such, the discretionary function exception is inapplicable.

*Abandonment of Old Gas Line.*

Finally, with respect to the improperly abandoned gas line, there was testimony that upon discovering this line, the locator, Sacco, had a responsibility to tell a supervisor that the line had not been properly abandoned. MUD's locating manual sets forth the procedure to be followed in this event. Where service records are in need of correction, the locating manual provides that a locator "shall" call it into dispatch or fill out forms reporting the error. In addition, MUD has a separate procedure manual for use in the event that it needed to abandon a gas line. This, also, was not a matter of choice, and the discretionary function exception does not provide immunity. There is no merit to MUD's assignments of error.

## CONCLUSION

We find no error in the district court's denial of summary judgment in each case finding that MUD was not immune from suit. That the gas lines were to be clearly marked, the gas to be shut off by MUD in the event of a gas fire, and the gas lines to be properly abandoned were not matters of choice. Each was required, at a minimum, by our case law regarding dangerous conditions and by MUD's own policies, and were not protected by the discretionary function exception to the PSTCA. As such, in each case, the decision of the district court is affirmed.

Affirmed.