BLOOM TOWNSHIP HIGH SCHOOL *et al.*, Petitioners, v. ILLINOIS COMMERCE COMMISSION *et al.*, Respondents.

First District (4th Division)   No. 1—99—0625

Opinion filed November 24, 1999.

Giordano & Associates, of Chicago (Patrick N. Giordano and Thomas A. Andreoli, of counsel), for petitioners.

Hopkins & Sutter, of Chicago (William J. McKenna, David B. Goroff, Ross E. Kimbarovsky, Pamela B. Strobel, and Simone Byvoets, of counsel), for respondents.

JUSTICE HOFFMAN delivered the opinion of the court:

The petitioners, Bloom Township High School, K&M Plastics, Inc., Marshall Field & Company (Marshall Field), and St. Therese Medical Center, filed separate complaints with the Illinois Commerce Commission (Commission) against the respondent, Commonwealth Edison Company (ComEd), alleging that ComEd wrongfully assessed penalty fees and other charges against them for excessive use of electrical power during the "heat wave" in July 1995. The Commission consolidated the complaints and subsequently entered summary judgment in favor of ComEd. The petitioners have filed a joint petition for review, contending that the Commission erred in granting summary judgment for the following reasons: (1) the "Rider 30 Interruptible/ Curtailment Service" tariff (Rider 30), under which they were receiving electrical power, required ComEd to make reasonable efforts to provide them with "buy-through energy"[1] in lieu of curtailment; (2) the Commission violated section 2—1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2—1005 (West 1996)) by determining on

---

[1]The term "buy-through energy" refers to energy that is purchased by customers at a specified rate during a curtailment period in lieu of reducing their energy demand to their preestablished firm power level.

summary judgment that ComEd made reasonable efforts to provide buy-through energy and that "emergency conditions" existed on July 14, 1995, such that the purchase of buy-through energy was impermissible; and (3) the Commission erred in denying Marshall Field's motion for summary judgment, asserting that it did not receive proper notice of the curtailment.

ComEd filed a tariff with the Commission, known as Rider 30, the purpose of which is to assist ComEd in providing cost-effective and reliable electricity by reducing the amount of electricity that ComEd must provide during peak periods of demand. Service pursuant to Rider 30 is available to certain nonresidential customers of ComEd who have discretionary electrical loads that can be interrupted or curtailed. Under Rider 30, customers such as the petitioners enter into contracts with ComEd and agree to reduce their electricity usage to a preestablished firm power level[2] (FPL) upon request by ComEd. In exchange for their commitment to limit their electricity usage, ComEd agrees to compensate the customers by applying credits to their electricity bills.

Pursuant to Rider 30, the customers must elect to receive service under one of three options (A, B, or C). The three types of service differ in the number of interruptions or curtailments ComEd is allowed to invoke per year, the maximum number of hours an interruption or curtailment may last, the extent of the notice period before a curtailment can be initiated, the credits to which the customer is entitled, and the ability of the customer to purchase buy-through energy in lieu of curtailment. In this case, all of the petitioners elected to receive service under option C, which specifically provides:

> "Under this option, the customer may purchase energy during a curtailment period at a cost of $.15/kWh for all kilowatthours consumed during the curtailment period associated with 30-minute demands which exceed the customer's Firm Power Level. Such purchases are referred to as purchases in lieu of curtailment. Demand levels associated with such purchases shall be considered when determining the customer's Maximum Demand as determined by the otherwise applicable rate. *The availability of such energy shall be at the discretion of the Company*, which shall notify the customer of its expected availability at the time the notice of curtailment is given. *A reasonable effort to maintain that availability during a curtailment period will be made.* The customer

---

[2] As defined in Rider 30, the term "Firm Power Level" means "[t]he amount of contracted demand, as determined initially by the customer at [the] time of application, that is not subject to interruption or curtailment."

shall not be allowed to make purchases during emergency conditions." (Emphasis added.)

Rider 30 further provides that all customers, other than those option C customers who purchase buy-through energy, shall be assessed a penalty[3] if their demand for power during a curtailment exceeds their preselected FPL.

According to the parties, on July 13, 1995, the temperatures in the Chicago area reached record levels and ComEd experienced a system peak demand for power. ComEd gave its option C customers notice of a curtailment and provided them with the opportunity to purchase buy-through energy. On July 14, 1995, the temperatures again reached record levels, and ComEd issued another curtailment. This time, ComEd did not offer its option C customers buy-through energy, and all of the petitioners refused to limit their energy usage during the curtailment. As a result, ComEd imposed penalty fees and other charges against them for their energy demand that exceeded their FPL during the curtailment. Each of the petitioners subsequently filed a complaint with the Commission, alleging that ComEd misapplied Rider 30 and wrongfully assessed penalty fees and other charges against them because ComEd failed to make reasonable efforts to provide them with buy-through energy during the curtailment as required by option C. The petitioners did not challenge the amount of the fees and charges assessed against them. In fact, they admitted that, if ComEd was entitled to such fees, then the amounts assessed against them were correct. The Commission consolidated the petitioners' complaints and scheduled an evidentiary hearing for April 20, 1998.

Prior to the hearing, both the petitioners and ComEd submitted extensive written testimony in support of their positions, as permitted by section 200.660 of the Public Utilities Rules of Practice (83 Ill. Adm. Code § 200.660 (1996)).[4] At the hearing, Marshall Field presented the testimony of Andrew J. Sebescak, its senior maintenance

---

[3]Under Rider 30, customers who exceed their FPL during a curtailment period are subject to a penalty of $30 per kW multiplied by the maximum amount of such excess kW over the FPL.

[4]The petitioners submitted written testimony from John C. Dolak of Bloom Township High School, Martin J. Egan of K&M Plastics, Inc., Andrew J. Sebescak of Marshall Field, Pamela J. Stoyanoff of St. Therese Medical Center, Philip M. Rosenberg of UTIL, Inc., and Keith E. Goerss of QST Energy, Inc. Other than Sebescak and Goerss, none of these witnesses submitted an affidavit in support of the petitioners' motion and their testimony is not contained in the record on appeal. ComEd submitted written testimony from two of its employees: Paul R. Crumrine and A. Daniel Gorski.

manager. Following Sebescak's testimony, the hearing examiner gave the parties the option of either limiting the cross-examination of all witnesses to 15 minutes or filing written briefs regarding the issue of whether Rider 30 required ComEd to make reasonable efforts to provide its option C customers with buy-through energy during a curtailment period. The parties objected to limiting the time allowed for cross-examining witnesses. Although the parties agreed that a threshold question existed as to whether option C required ComEd to use reasonable efforts to provide buy-through energy in lieu of curtailment, they disagreed as to whether the decision on this issue was outcome determinative. Consequently, the petitioners objected to the suggestion of filing cross-motions on this issue and expressed their desire to proceed with the hearing. After a lengthy discussion, the hearing examiner stated:

"[S]ince the parties are not in agreement, I just need to make a ruling or issue a direction which I feel is going to be of benefit to the Commission.

And so to that end, what I am going to direct the parties to do is to, basically, brief for me, and it can be done in the form of a motion for summary judgment with memo attached, again, with any type of testimony attached as exhibits, to indicate what the parties' positions are in regards to the interpretation of Rider 30C."

On May 7, 1998, the petitioners filed a motion for summary judgment and a memorandum in support thereof, arguing that the Commission should grant summary judgment in their favor because: (1) ComEd had a duty to make reasonable efforts to provide buy-through energy during the July 14, 1995[5], curtailment period; and (2) ComEd failed to provide Marshall Field with proper notice of the curtailment. The following documents were attached to the petitioners' memorandum: (1) an affidavit from Sebescak, stating that Marshall Field did not receive written notice of the curtailment; (2) the Rider 30 contract between Marshall Field and ComEd; (3) Rider 30; (4) a Rider 30 analysis report prepared for Marshall Field by ComEd's technical services department; and (5) ComEd's rate schedule sheets and supplemental materials regarding Advice No. H301[6] that were filed with the chief clerk of the Commission on August 5, 1997.

---

[5]In their motion, the petitioners inadvertently referred to the date upon which the curtailment in question occurred as July 13, 1995. They subsequently filed a motion to correct their mistake and change the date of the curtailment to July 14, 1995.

[6]In this filing, ComEd proposed various revisions to Rider 30, including changes to the language contained in option C. ComEd proposed to change the language regarding purchases in lieu of curtailment to read in part: "The

The following day, ComEd filed its motion for summary disposition, alleging that the penalty fees and charges assessed against the petitioners were proper based on the plain and unambiguous language of option C. ComEd argued that option C clearly provides that it has discretion to decide whether to offer buy-through energy during a curtailment and that it is only required to make reasonable efforts to maintain the availability of buy-through energy if it has first elected, in its sole discretion, to offer buy-through energy to its option C customers. ComEd also argued that the petitioners' interpretation of option C did not correspond with the purpose of Rider 30, which was to "maintain an appropriate level of interruptible load resources in a cost effective manner, thus deferring the need for additional capacity resources *** by reducing peak period loads." According to ComEd, the petitioners' interpretation was inconsistent with the requirement that it provide option C customers with notice of the availability of buy-through energy four hours prior to a curtailment. In the alternative, ComEd argued that, even if it was required to make reasonable efforts to provide buy-through energy to its option C customers, it did so in this case.

Attached to ComEd's motion was an affidavit from A. Daniel Gorski, its bulk power operations manager. In his affidavit, Gorski stated that, based on his 20 years of experience in bulk power operations, he believed that the information provided to ComEd on July 14, 1995, supported its conclusion that buy-through energy would not have been available on the open market during the curtailment period. He stated that ComEd took continuous surveys of the market[4] to determine whether any utilities were willing to preschedule energy sales to ComEd before deciding not to offer buy-through energy. According to Gorski, ComEd could not be certain that purchases of hourly energy would be possible on the spot wholesale market. Gorski further stated that, based on the conditions at the time, ComEd had determined that if the demand for energy was not curtailed it would not have enough power to fully service the firm load of its customers.

ComEd also filed a memorandum in response to the petitioners' motion for summary judgment and in further support of its motion for summary disposition. Attached to ComEd's memorandum was an excerpt from the hearing on April 20, 1998, containing Sebescak's

availability of such energy shall be at the discretion of the Company ***. If the Company has given notice that it expects such energy will be available during a curtailment, the Company will make a reasonable effort to maintain that availability during that curtailment period." ComEd subsequently withdrew its proposal.

admission that he knew about the expected curtailment four hours in advance, that he was not in Marshall Field's State Street store on July 14, 1995, and that he did not know if written notice of the curtailment was provided to Marshall Field by ComEd. Also attached to the memorandum were affidavits from Jose G. Andrade and Sharon S. Kochanek, account managers in ComEd's energy services department. Andrade stated in his affidavit that four hours prior to the curtailment on July 14, 1995, he left detailed voice-mail messages for Sebescak and Thomas Mecham, who was also employed in the maintenance operations department at Marshall Field. He informed them that the curtailment would begin at 12:30 p.m. and end at 6:30 p.m., that buy-through energy would not be available, and that Marshall Field should curtail its energy usage to avoid being charged penalties under Rider 30. About $1^{1/2}$ hours later, Andrade again left detailed voice-mail messages concerning the curtailment for both Mecham and Sebescak. Kochanek stated in her affidavit that she also left detailed voice-mail messages for Sebescak and Mecham and even attempted to page Mecham. In addition, she spoke to Joe Tomaso, another Marshall Field employee, who stated that Marshall Field would not curtail its energy demand during the curtailment. Kochanek also called Chuck Clark at Marshall Field's corporate headquarters in Minnesota and left a message with his secretary regarding the curtailment and stating that buy-through energy would not be available.

The petitioners filed a reply to ComEd's motion for summary disposition, attaching the rebuttal and surrebuttal testimony of Keith E. Goerss, the director of economics and planning for QST Energy, Inc., a full-service energy company. Goerss's written testimony contained his opinion that option C did not provide ComEd with complete discretion in determining whether to provide buy-through energy and that ComEd did not take reasonable steps to insure the availability of buy-through energy on July 14, 1995. According to Goerss, reasonable efforts would include determining whether ComEd or another supplier (*i.e.*, utilities, marketers, municipalities, or rural electric cooperatives) had energy available at a rate less than 15 cents per kWh that could be provided to ComEd's option C customers. Goerss did not dispute Gorski's testimony that ComEd surveyed other utility companies and the spot wholesale market to determine if such energy would likely be available during the curtailment. He believed, however, that ComEd's efforts were unreasonable because it failed to continue those efforts up to the time of the curtailment. On September 21, 1998, the hearing examiner submitted her proposed order to both parties and informed them of their right to file a "Brief on Exceptions." 83 Ill. Adm. Code §§ 200.820, 200.830 (1996). The petitioners filed such a brief, raising

eight exceptions to the proposed order. In addition to the arguments that the petitioners previously raised before the hearing examiner, they argued that the order incorrectly stated that the parties agreed to submit cross-motions for summary judgment. The petitioners stated that the hearing examiner gave them two options, neither of which was acceptable. They could either agree to limit the cross-examination of witnesses to 15 minutes, which they argued violated their due process rights, or they could submit cross-motions for summary judgment. When they refused to choose either option, the hearing examiner ordered the parties to file cross-motions for summary judgment. The petitioners, however, only requested that the proposed order be revised to reflect that they did not agree to such a procedure. ComEd filed a reply to the petitioners' brief in which it stated that the petitioners agreed that the dispute between the parties was based on the interpretation of option C and, therefore, was a question of law to be decided by the Commission.

On December 16, 1998, the Commission issued an order in which it concluded that Rider 30 was not ambiguous. The Commission stated that, based on the plain language of the Rider, ComEd had "discretion" to decide whether to offer buy-through energy to its option C customers and that ComEd was not required to make reasonable efforts to maintain the availability of buy-through energy before initiating a curtailment period. In pertinent part, the order states:

> "The Commission concludes that Rider 30C is not ambiguous. Under its plain meaning, ComEd has 'discretion' in deciding whether to offer buy-through energy during a curtailment. ComEd need not first make reasonable efforts to source buy-through power, before deciding not to offer buy-through. It has full discretion to decide whether to offer buy-through. If ComEd has given notice to its Rider 30C customers that it expects buy-through energy to be available during a curtailment, is it [sic] then required to make a reasonable effort to maintain the availability of such buy-through energy during the curtailment period. However, if ComEd has stated at the time it issues its notice of curtailment that buy-through energy will not be available, it has no obligation to provide buy-through energy."

In the alternative, the Commission held that, even if ComEd was required to use reasonable efforts to provide buy-through energy during a curtailment, it presented uncontroverted evidence that it made reasonable efforts to do so but was unable to locate buy-through energy within its own system or from third-party sources. The Commission also found that ComEd could not have provided its option C customers with buy-through energy because of the emergency conditions that existed on July 14, 1995.

The Commission also rejected Marshall Field's claim that it did not receive proper notice of the curtailment. The Commission found that Sebescak's affidavit was improper under Supreme Court Rule 191 (145 Ill. 2d R. 191) because it was conclusory and not based on his personal knowledge. The Commission noted that Sebescak admitted in his testimony on April 20, 1998, that he was personally notified of the curtailment by ComEd more than four hours in advance. It further found the testimony of both Andrade and Kochanek to be persuasive. The Commission concluded that neither Rider 30 nor the contract between Marshall Field and ComEd required ComEd to provide Marshall Field with written notice of an expected curtailment.

The petitioners subsequently filed an application for rehearing (83 Ill. Adm. Code § 200.800 (1996)), raising essentially the same issues previously argued before the hearing examiner. In addition, they again questioned the hearing examiner's order requiring the parties to file cross-motions for summary judgment. The Commission denied the petitioners' application, and they filed a timely petition for review with the clerk of this court.

The original petition for review filed in this case named the Commission as the only respondent, prompting ComEd to file a motion to dismiss this appeal on the basis that the petitioners failed to name all the necessary parties as required by Supreme Court Rule 335 (155 Ill. 2d R. 335). Four days later, the petitioners filed a motion for leave to amend their "Joint Petition for Review," and ComEd subsequently filed a motion to withdraw its motion to dismiss. All of these motions were taken with the case.

■ Section 10—201 of the Public Utilities Act (220 ILCS 5/10—201 (West 1996)) provides that a party affected by a final order or decision of the Commission "may appeal to the appellate court of the judicial district in which the subject matter of [the] hearing is situated *** for the purpose of having the reasonableness or lawfulness of the rule, regulation, or decision inquired into and determined." However, before considering the merits of this appeal, we have an affirmative duty to determine whether our jurisdiction has been properly invoked. *Board of Education of School District No. 122, Cook County v. Illinois State Board of Education*, 209 Ill. App. 3d 542, 545, 568 N.E.2d 289 (1991). Consequently, we must address the merits of ComEd's motion to dismiss without regard to the fact that ComEd has moved to withdraw the motion.

Supreme Court Rule 335 provides in part:

"The procedure for a statutory direct review of orders of an administrative agency by the Appellate Court shall be as follows:

(A) The Petition for Review. The petition for review shall be filed

in the Appellate Court and shall specify the parties seeking review and shall designate the respondent and the order or part thereof to be reviewed. The agency and all other parties of record shall be named as respondents." 155 Ill. 2d R. 335.

Rule 335 also contains an example of the caption for such a petition, which includes a place to put the name of the administrative agency whose decision is being appealed, as well as the names of other parties of record. 155 Ill. 2d R. 335. There is no doubt that the petitioners failed to satisfy these requirements. They, however, argue that their failure to name a necessary party was neither intentional nor strategic but, rather, was due to the conflicting rules contained in section 200.890 of the Public Utilities Rules of Practice (83 Ill. Adm. Code § 200.890 (1996)) and Rule 335. Section 200.890 provides that "[t]he notice of appeal filed with the Commission shall be captioned '(The name of appellant) v. Illinois Commerce Commission.' " Thus, the issue we must resolve is whether the petitioners' failure to comply with Rule 335 and name ComEd as a party respondent on the face of their petition is a fatal defect which deprives this court of jurisdiction.

In *Lipsey v. Human Rights Comm'n*, 267 Ill. App. 3d 980, 984, 642 N.E.2d 746 (1994), this court considered the issue presently before us at great length and determined that the requirement to name all necessary parties was mandatory, but that the failure to do so would not require dismissal if the petitioners made a good-faith showing of compliance. See also *Worthen v. Village of Roxana*, 253 Ill. App. 3d 378, 380-82, 623 N.E.2d 1058 (1993). Given the confusion between section 200.890 and Rule 335, and the fact that ComEd was properly served with notice of the petition, we believe that the petitioners acted in good faith. Furthermore, as in *Lipsey*, 267 Ill. App. 3d at 986, the petitioners sought leave to amend their petition four days after ComEd filed its motion to dismiss and only 3½ months after the Commission issued its order. We, therefore, conclude that we have jurisdiction over this appeal and grant both the petitioners' motion for leave to amend their petition and ComEd's motion to withdraw its motion to dismiss.

■ Before addressing the merits of this appeal, we wish to make it clear that we are not unmindful that the hearing examiner in this case initiated a rather unusual procedure by interrupting the hearing and directing the parties to file cross-motions for summary judgment. Although the Commission's order states that it was agreed between the parties and the hearing examiner that cross-motions for summary judgment would be filed, the record indicates otherwise. Our reading of the record reveals that the petitioners objected to the procedure suggested by the hearing examiner, and, despite their objection, she directed the parties to file cross-motions for summary judgment. The

petitioners questioned the hearing examiner's direction in their brief on exceptions filed with the Commission, but they did not raise the issue in their appellate brief. Consequently, any error that might have been interjected into the proceedings by reason of the procedure employed by the hearing examiner is waived for purposes of this appeal. 155 Ill. 2d R. 341(e)(7); see also *Abbott Laboratories, Inc. v. Illinois Commerce Comm'n*, 289 Ill. App. 3d 705, 710, 682 N.E.2d 340 (1997).

Turning to the merits of this appeal, we will first address the Commission's finding that ComEd is not required to make reasonable efforts to source buy-through power before deciding not to offer same to its Rider 30C customers during a curtailment. Both ComEd and the petitioners argue that the language of Rider 30C is clear and unambiguous, but they offer conflicting interpretations. The petitioners argue that, during a curtailment, ComEd is required to make reasonable efforts to procure buy-through power for its option C customers. ComEd argues that the decision as to whether buy-through power will be offered to option C customers during a curtailment is a matter committed to its discretion, and consequently, it need not make reasonable efforts to procure buy-through power before deciding not to offer it. After finding that Rider 30 is not ambiguous, the Commission adopted ComEd's interpretation.

■ Rider 30 is a utility tariff. Consequently, its construction is a question of law and the Commission's interpretation is not binding upon this court. *People ex rel. Hartigan v. Illinois Commerce Comm'n*, 148 Ill. 2d 348, 367, 592 N.E.2d 1066 (1992). Because the question is one of law, our review is *de novo. Branson v. Department of Revenue*, 168 Ill. 2d 247, 254, 659 N.E.2d 961 (1995). We will, however, accord the Commission's interpretation deference in the event that we find the tariff ambiguous. See *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98, 606 N.E.2d 1111 (1992). Whether a utility tariff is ambiguous is also a question of law and subject to *de novo* review. *General Mills, Inc. v. Illinois Commerce Comm'n*, 201 Ill. App. 3d 715, 720, 559 N.E.2d 225 (1990).

■ Although a utility tariff is not a legislative enactment, its interpretation is governed by the rules of statutory construction. See *General Mills*, 201 Ill. App. 3d at 720. Statutes are ambiguous when they admit of more than one reasonable interpretation. *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 51, 563 N.E.2d 465 (1990). We have applied the same rule to determine if Rider 30 is ambiguous. For the reasons that follow, we too find that Rider 30 is not ambiguous as it admits of only one reasonable interpretation, albeit not the one proffered by ComEd or the petitioners.

■ ■ According to the Commission, ComEd need not exercise reasonable efforts to source buy-through energy before deciding not to offer it to its option C customers during a curtailment because Rider 30 gives ComEd discretion in determining whether to offer buy-through energy in the first instance. Taken to its logical extension, this interpretation permits ComEd to arbitrarily decline to offer buy-through energy to its option C customers for any reason or no reason. We find such an interpretation not only unreasonable, but wholly inconsistent with the Public Utilities Act (220 ILCS 5/1—101, *et seq.* (West 1998)).

The very purpose of the Public Utilities Act is to maintain control over the operation of utilities so as to prevent them from exacting unjust, unreasonable, and discriminatory rates. The theory behind the regulation of public utilities is the protection of the public and the assurance of adequate service while, at the same time, securing for the utility a fair opportunity to generate a reasonable return. *Village of Monsanto v. Touchette*, 63 Ill. App. 2d 390, 400, 211 N.E.2d 471 (1965). The Commission exists to maintain a balance between the rates charged by utilities and the services they perform. *Village of Apple River v. Illinois Commerce Comm'n*, 18 Ill. 2d 518, 523, 165 N.E.2d 329 (1960). A utility tariff, such as Rider 30, falls within the definition of a "rate" as contained in the Public Utilities Act (see 220 ILCS 5/3—116 (West 1998)), and that act mandates that all rates must be reasonable. 220 ILCS 5/9—101 (West 1998). The notion that a public utility might be vested with unfettered discretion and the ability to act arbitrarily in the rendition of service to its customers is the antithesis of the purposes for regulating utilities. For this reason alone, we find that the Commission's interpretation of Rider 30 is unreasonable.

If Rider 30 were a garden variety contract, it would never be interpreted as permitting ComEd to exercise its discretion arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties. Absent an express disavowal, every contract, as a matter of law, contains an implied covenant of good faith and fair dealing which requires a party vested with contractual discretion to act reasonably in its exercise. *Perez v. Citicorp Mortgage, Inc.*, 301 Ill. App. 3d 413, 423-24, 703 N.E.2d 518 (1998). Although a utility tariff has the force of law and is not considered to be a contract (*Illinois Central Gulf R.R. Co. v. Sankey Brothers, Inc.*, 67 Ill. App. 3d 435, 439, 384 N.E.2d 543 (1978)), we fail to see any logic in a rule absolving a public utility from acting reasonably in the exercise of its discretion merely because it is vested with such power by a tariff as opposed to a contract.

Rider 30 governs the rights and obligations of ComEd and its

customers in the same manner as would a contract. Customers choosing option C obviously have some reasonable expectations regarding the availability of buy-through power during a curtailment. A simple comparison of the terms of options B and C reveals that the only advantages to electing option C is that option C customers are given two hours more notice of a curtailment, and, unlike option B customers, they may be able to purchase buy-through energy. Customers choosing option C are subject to 15 more curtailments annually and receive much lower credits against their charges than do customers electing option B. Absent a reasonable expectation that ComEd will offer buy-through power during a curtailment, there would be no benefit to choosing option C over option B.

The Commission correctly found that Rider 30 vests ComEd with discretion in determining whether to offer buy-through power to its option C customers during a curtailment. It erred in concluding that this discretion means that ComEd need not make reasonable efforts to source buy-through power before deciding not to offer it to its option C customers. Our conclusion in this regard does not mean that we accept the petitioners' interpretation of Rider 30. We do not.

Just as the plain language of Rider 30 cannot be interpreted as granting ComEd a license to arbitrarily refuse to offer buy-through power to its option C customers during a curtailment, neither should it be interpreted as mandating that ComEd source buy-through power before deciding not to offer it. Depending upon the circumstances of any given case, the failure to source buy-through power may, or may not, constitute a reasonable exercise of the discretion vested in ComEd under the terms of Rider 30. As the Commission correctly observed: "Particular actions which are reasonable will depend upon the situation at the time of the specific curtailment."

Our analysis of Rider 30 leads us to conclude that it must be interpreted as requiring ComEd to act reasonably under the circumstances in exercising its discretion to determine if buy-through energy will be offered to option C customers during a curtailment. However, it cannot be said, as a matter of law, that a reasonable exercise of that discretion does, or does not, require that ComEd source buy-through energy before deciding not to offer it. That question is one of fact to be decided on a case-by-case basis.

Next, we will address the petitioners' contention that the Commission erred in determining that ComEd used reasonable efforts to source buy-through energy during the curtailment on July 14, 1995, and that "emergency conditions" existed on that date that precluded ComEd from offering buy-through energy to its option C customers. On this issue, we need go no further than an application of the

traditional rules attendant to summary judgment proceedings to support our conclusion that the petitioners' assignment of error is well taken.

■ Granting summary disposition in an administrative proceeding is comparable to granting summary judgment under section 2—1005 of the Code of Civil Procedure (735 ILCS 5/2—1005 (West 1998)). *Cano v. Village of Dolton*, 250 Ill. App. 3d 130, 138, 620 N.E.2d 1200 (1993). Because of the similarities in the two procedures, it is appropriate to apply the standards applicable to granting summary judgment under section 2—1005 when reviewing a summary determination entered by an administrative agency. See *Cano*, 250 Ill. App. 3d at 138.

Summary judgment is a drastic means of disposing of litigation and should be employed only when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *Purtill v. Hess*, 111 Ill. 2d 229, 240, 489 N.E.2d 867 (1986). In determining the existence of a genuine issue of fact, the evidentiary material of record must be construed strictly against the movant and liberally in favor of the opponent. *Purtill*, 111 Ill. 2d at 240. If that evidentiary material could lead to more than one reasonable inference or conclusion, the one most favorable to the opponent of the motion must be adopted. *Lapidot v. Memorial Medical Center*, 144 Ill. App. 3d 141, 147, 494 N.E.2d 838 (1986). The purpose of a summary judgment proceeding is to determine the existence of a genuine issue of material fact, not to resolve the issue. *Addison v. Whittenberg*, 124 Ill. 2d 287, 294, 529 N.E.2d 552 (1988).

The findings and conclusions of the Commission on questions of fact are held to be *prima facie* true (220 ILCS 5/10—201(d) (West 1998)) and will not be disturbed on appeal unless they are against the manifest weight of the evidence. *Hartigan*, 148 Ill. 2d at 367. However, the resolution of a motion for summary judgment is not based on findings or conclusions of fact; rather, it is a question of law subject to *de novo* review. *In re Estate of Hoover*, 155 Ill. 2d 402, 411, 615 N.E.2d 736 (1993). An order granting a summary judgment will be reversed on appeal if the reviewing court determines that a genuine issue of material fact exists. *Addison*, 124 Ill. 2d at 294.

■ As an alternative ground for granting summary judgment in favor of ComEd, the Commission held that, "even if Rider 30C did require ComEd to use reasonable efforts to source or provide buy-through energy to its customers during a curtailment, ComEd presented undisputed facts that it did, in fact, use reasonable efforts, but still was unable to make buy-through energy available on July 14, 1995." The record in this case clearly contains evidentiary material

supporting the proposition that ComEd used reasonable efforts to source buy-through energy, but that material is by no means undisputed. As stated earlier, the petitioners submitted the affidavit of Goerss in opposition to ComEd's motion for summary disposition. According to Goerss, ComEd's efforts to source buy-through energy were not reasonable because ComEd did not continue those efforts up to the time of the curtailment. Standing alone, this opinion created a disputed issue of fact on the question of whether ComEd's efforts were reasonable, precluding a resolution of the question by means of a summary judgment.

The Commission also found that emergency conditions existed on July 14, 1995. This finding is of significance in light of the fact that Rider 30C provides that option C customers are not permitted to purchase buy-through energy during emergency conditions. However, Rider 30 does not define "emergency conditions." According to the Commission, emergency conditions are "unexpected conditions, internal or external to ComEd's portion of the integrated electrical generation, transmission, and distribution system, which may, in ComEd's determination, jeopardize the reliability or stability of the whole or any part of the system, or which may impair ComEd's ability to operate its facilities economically and safely in accordance with the operating practices and requirements of FERC, the Illinois Commerce Commission, NERC, MAIN and ComEd." Assuming for the sake of analysis that we accept the Commission's definition of "emergency conditions," we must still address the question of whether the Commission correctly determined, as a matter of law, that such conditions existed on July 14, 1995.

In support of its conclusion that emergency conditions existed, the Commission noted that: the ambient temperature was 100 degrees for the second straight day; the temperature on July 13, 1995, was 106 degrees; ComEd experienced an all-time system peak demand on July 13; and ComEd implemented numerous demand-side options from its "Emergency Load Conservation Procedures" to reduce anticipated record peak loads. These facts could certainly support the conclusion that an emergency condition, as defined by the Commission, existed on July 14, 1995. However, we note that, with the exception of July 14, 1995, being the second straight day of temperatures in excess of 100 degrees, all of the same conditions existed on July 13, 1995, when ComEd offered buy-though energy to its option C customers during a curtailment. If these conditions did not constitute emergency conditions preventing the purchase of buy-through energy on July 13, 1995, one might reasonably conclude that no emergency conditions preventing the purchase of buy-through energy existed on July 14, 1995, ei-

ther. The petitioners also point out that ComEd never notified its option C customers that buy-through energy would not be available on July 14, 1995, due to the existence of emergency conditions. Although ComEd is correct in its assertion that Rider 30 does not require it to notify its customers of the existence of emergency conditions, we believe that it is reasonable to infer that ComEd knows when such conditions exist, especially in view of the fact that the Commission's own definition provides in part that the existence of an emergency condition is determined by ComEd. Nevertheless, ComEd's own submissions in support of its motion for a summary determination reveal that it actually made some effort to procure buy-through energy on July 14, 1995, supporting the inference that no emergency conditions existed that would prevent it from providing buy-through energy to its option C customers. Simply put, the evidence in the record evinces a genuine issue of fact on the question of whether emergency conditions existed on July 14, 1995, that precluded the petitioners from purchasing buy-through energy during the curtailment.

■ The final issue to be determined is whether the Commission erred in denying Marshall Field's motion for summary judgment premised upon the assertion that it did not receive proper notice of the July 14, 1995, curtailment. We begin our analysis of this issue by noting that the purpose of a notice provision in either a contract or a statute is to ensure that a party is actually informed. See *Rogers v. Balsley*, 240 Ill. App. 3d 1005, 1011, 608 N.E.2d 1288 (1993); *Shipley v. Stephenson County Electoral Board*, 130 Ill. App. 3d 900, 903-04, 474 N.E.2d 905 (1985). It is undisputed that Marshall Field received actual notice of the curtailment within the time period provided under option C. Nevertheless, Marshall Field contends that, since it did not receive printed notice of the curtailment through a dedicated telephone line located at the "Held Desk" at its State Street store, it did not receive the notice provided for in Rider 30 and its contract with ComEd. It concludes, therefore, that the Commission erred in failing to grant its motion for summary judgment. We disagree.

Neither Rider 30 nor the contract between ComEd and Marshall Field requires that printed notice of a curtailment be given to Marshall Field via a dedicated telephone line located at its "Help Desk." Rider 30 merely states that ComEd "shall notify" its option C customers of a curtailment and the availability of buy-through energy at least four hours before the curtailment becomes effective. It does not require that the notice be in writing, nor does it mention the manner in which the notice must be delivered. The contract between Marshall Field and ComEd provides:

*"Customer Obligations*

(a) All notices of interruption or curtailment required to be provided by the Company under Rider 30 shall be provided by the Company to the Customer at its State Street Help Desk ***.

(b) The Customer shall at its expense install, own, and maintain a dedicated telephone line for the Rider 30 notification system at the State Street store."

Although this paragraph requires ComEd to provide Marshall Field with notice at its "Help Desk," it does not require that the notice be in writing or that ComEd necessarily use the dedicated telephone line to provide such notice. See *Prairie Management Corp. v. Bell*, 289 Ill. App. 3d 746, 752, 682 N.E.2d 141 (1997). Although not argued by ComEd, we note that Sebescak testified before the hearing examiner that the designated printer was not operating on July 14, 1995.

Even if we were to assume for the sake of analysis that ComEd did not strictly comply with the notice provision of Rider 30 or its contract with Marshall Field, the fact remains that Marshall Field received actual notice of the curtailment within the time provided under option C. As stated in *Vole, Inc. v. Georgacopoulos*, 181 Ill. App. 3d 1012, 1019, 538 N.E.2d 205 (1989), the "object of notice is to inform the party [to be] notified, and if the information is obtained in any way other than formal notice, the object of notice is attained."

For these reasons, we do not believe that ComEd's failure to give Marshall Field written notice of the curtailment at its "Help Desk" constituted a material breach of Rider 30 or the contract between the parties, especially where it is evident that Marshall Field received actual notice and claims no prejudice. See *In re Splett*, 143 Ill. 2d 225, 231-32, 572 N.E.2d 883 (1991); *Prairie Management Corp.*, 289 Ill. App. 3d at 752. We, therefore, affirm the Commission's denial of Marshall Field's motion for summary judgment.

In summary, we: (1) affirm the Commission's denial of Marshall Field's motion for summary judgment; (2) reverse the Commission's order granting summary judgment in favor of ComEd; and (3) remand this matter to the Commission for further proceedings.

Affirmed in part; reversed in part and remanded.

SOUTH and HOURIHANE, JJ., concur.