CHRISTY A. ADAMS, as Special Adm'r of the Estate of Janice G. Adams, Deceased, Plaintiff-Appellant, v. NORTHERN ILLINOIS GAS COMPANY, Defendant-Appellee.

First District (1st Division)   No. 1—01—0303

Opinion filed June 28, 2002.—Rehearing denied August 23, 2002.—Modified opinion filed August 26, 2002.

George J. Tzanetopoulos and Robert M. Dow, Jr., both of Mayer, Brown & Platt, of Chicago, for appellant.

Thomas R. Rakowski, of Connelly, Roberts & McGivney, L.L.C., and Hilfman, Fogel, Martin & Barr, P.C., both of Chicago, for appellee.

JUSTICE COUSINS delivered the opinion of the court:

On December 7, 1995, Janice Adams died as a result of an explosion and fire at her home in Calumet City, Illinois. Christy Adams

(plaintiff), as special administrator of the estate of Janice Adams, deceased, filed a wrongful death suit against Lucia Georgevich and Northern Illinois Gas Company (NI-Gas). On September 13, 2000, the trial court granted summary judgment in favor of NI-Gas and deemed Georgevich's motion for summary judgment moot. On December 22, 2000, the trial court denied Adams' motion to reconsider. On January 18, 2001, the trial court also denied plaintiff's motion to take evidence depositions to preserve testimony. Adams presents the following issues for review on appeal: (1) whether the trial court erred in granting summary judgment in favor of NI-Gas; and (2) whether the trial court abused its discretion in denying plaintiff's motion to perpetuate testimony.

## BACKGROUND

Janice Adams was a 48-year-old mother of two when she died on December 7, 1995, as a result of a natural gas explosion and fire at her home. Christy Adams, as special administrator of the estate of Janice Adams, deceased, originally filed a wrongful death action against the homeowner, Lucia Georgevich, and later added NI-Gas.

Assistant chief of the Calumet City fire department Dan A. Smits stated in his pretrial deposition that he believed that the fire originated at the home as a result of an explosion involving natural gas. He further opined that the location of the gas flow was the "Cobra" gas connector.

Cobra is a brand-name corrugated metal connector that was produced between 1955 and 1965 by a Chicago-based manufacturer that is no longer in business. It is undisputed that, in its original state, natural gas is odorless. By law, NI-Gas is required to supply odorized gas to its customers as a detection method.

Wayne Genck, a consultant on matters involving natural gas connectors, testified at deposition that the sulfur added to natural gas and phosphorous metal in flexible connectors have a reaction that produces a "corrosion product."

Plaintiff's expert, accident investigator Charles Lamar, testified that the source of the natural gas leak at the Adams' home was the failure of the flexible connector that connected the back of the range to the house piping, called the Cobra. He further testified that there was no failure in the NI-Gas facilities or the gas meter that led to the explosion. Lamar noted that phosphorus brazing was banned in 1968, and NI-Gas knew for decades about the failure of the "brazed joints" but did not take sufficient action to stop the use of those joints and did not warn the public about them.

Norman Breyer, Ph.D., testified that there was a good deal of

information circulated to the gas distributors starting in 1968 regarding the inherent weakness of the Cobra tubing connection and the danger of using brazing compounds that contained phosphorus because it caused the joints to become brittle. He further stated that "we know that there are sulphur compounds in the gas put in either as odorants or as trace elements for the gas that's being transmitted over the piping system." Dr. Breyer opined that "[s]ulphur caused the failure of the phosphorous that is inherent in that alloy, the brazing alloy."

The decedent's ex-husband, Leonard Adams, testified in deposition that he had observed NI-Gas employees read the gas meter in the utility room of the home on occasion, but they did not examine anything in the house other than the meter. In late 1978 or 1980, after having a new clothes drier installed by Sears, a gas leak was detected. Janice Adams called NI-Gas. A NI-Gas employee came to the home and checked a gas pipe that ran along the wall between the meter and the clothes drier. He discovered that it was leaking and tightened the pipe.

On June 21, 2000, NI-Gas filed a motion for summary judgment asserting that it did not owe a legal duty to Janice Adams. Georgevich also filed a motion for summary judgment.

On September 13, 2000, NI-Gas' motion for summary judgment was granted and Georgevich's motion for summary judgment was deemed moot. Plaintiff filed a motion to reconsider the September 13, 2000, order. On December 22, 2000, plaintiff's motion to reconsider was denied.

On January 12, 2001, plaintiff filed an emergency motion to take evidence depositions to preserve expert witness testimony. Plaintiff's emergency motion asserted that she had retained multiple expert witnesses who were "instrumental" to the plaintiff's cause of action, including Charles Lamar, Norman Breyer, and Edward Karnes. Based on the time to complete the appellate process and the age of the plaintiff's experts, plaintiff requested that the testimony of one or more of her experts be preserved in the event that the case was returned for trial. The trial court denied plaintiff's motion, reasoning that "[t]hey're not fact witnesses who are essential to proving the Plaintiff's or Defendant's cases." Plaintiff now appeals the grant of summary judgment in favor of NI-Gas and the denial of her emergency motion to preserve testimony.

## ANALYSIS

### I

Plaintiff asserts that NI-Gas owed Janice Adams a common-law duty to use every reasonable precaution to avoid injury to the person

or property of its customers and the trial court erred in granting summary judgment in favor of NI-Gas. NI-Gas responds that it owed no duty to plaintiff or her decedent under Illinois common law. Upon petition for rehearing, plaintiff frames the issue as follows: "whether a utility company which has actual knowledge of a dangerous condition associated with the use of its product *** which was in part created by the utility company, has any responsibility to its customers to warn them of that danger."

■ Appellate courts apply a *de novo* standard when reviewing summary judgment rulings. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party's right to judgment is clear and free from doubt. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995). Summary judgment is appropriate only when the pleadings, depositions, admissions, and affidavits on file, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. *Smith v. Allstate Insurance Co.*, 312 Ill. App. 3d 246, 251, 726 N.E.2d 1 (1999). Where a reasonable person could draw divergent inferences from undisputed facts, summary judgment should be denied. *Pyne v. Witmer*, 129 Ill. 2d 351, 358-59, 544 N.E.2d 1304 (1989).

■ Duty is defined as " 'a legal obligation to conform one's conduct to a certain standard for the benefit or protection of another.' [Citations.]" *Kurtz v. Wright Garage Corp.*, 262 Ill. App. 3d 1103, 1107, 635 N.E.2d 897 (1994). Whether a duty exists in a particular case is a question of law to be determined by the court (*Ward v. K mart Corp.*, 136 Ill. 2d 132, 554 N.E.2d 223 (1990)) and is determined by reference to whether the parties stood in such a relationship to each other that the law imposes an obligation on one to act for the protection of the other (*Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238, 665 N.E.2d 1260 (1996)). The factors relevant to the court's imposition of a duty include: (1) the likelihood of injury; (2) the reasonable foreseeability of such injury; (3) the magnitude of guarding against the injury; (4) and the consequences of placing that burden on the defendant. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 425, 706 N.E.2d 460 (1998); *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 453, 605 N.E.2d 493 (1992).

■ It is well settled in Illinois that " 'where a gas company does not install the pipes or fixtures and does not own them and has no control over them it is not responsible for their condition or for their maintenance, and as a result is not liable for injuries caused by a leak therein of which it has no knowledge.' " *Pioneer Hi-Bred Corn Co. of*

*Illinois v. Northern Illinois Gas Co.*, 61 Ill. 2d 6, 13, 329 N.E.2d 228 (1975), quoting *Clare v. Bond County Gas Co.*, 356 Ill. 241, 244, 190 N.E. 278 (1934). However, Illinois has not addressed a gas company's duty to warn its customers of the possible deterioration of those fixtures when they are damaged, in part, due to the gas product itself.

Plaintiff relies on two out-of-state cases to support her contention that NI-Gas owes a duty to warn: *Lemke v. Metropolitan Utilities District*, 243 Neb. 633, 502 N.W.2d 80 (1993), and *Halliburton v. Public Service Co. of Colorado*, 804 P.2d 213 (Colo. App. 1990).

In *Lemke*, the defendant gas company, Metropolitan Utilities District (MUD), asserted that it had no duty to notify its customers concerning a potential hazard from Cobra connectors. MUD service personnel had adjusted some of the plaintiff's gas ranges in 1986. *Lemke*, 243 Neb. at 652, 502 N.W.2d at 92. Although there was no evidence that the gas provider installed the Cobra connector to the plaintiff's gas range, there was evidence that the company installed thousands of Cobra connectors in homes of MUD customers. *Lemke*, 243 Neb. at 638, 502 N.W.2d at 84. There was no dispute that MUD possessed information regarding the potential hazard from the American Gas Association as early as 1979. See *Lemke*, 243 Neb. at 638, 502 N.W.2d at 84.

The Nebraska Supreme Court held that when a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity and the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by the dangerous condition or hazard, "the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard." *Lemke*, 243 Neb. at 647, 502 N.W.2d at 89. The court reasoned that "[w]hen MUD received information about the dangerous condition or potential hazard involving Cobra connectors but did not disseminate this critical information to its customers who were using gas appliances with Cobra connectors, MUD effectively exerted control in a situation that could eventually culminate in injury to customers who continued to use gas supplied by MUD." *Lemke*, 243 Neb. at 648, 502 N.W.2d at 89. Further, "when MUD became aware that the distribution of gas through a Cobra connector presented a risk of injury to customers, MUD had the duty to use due care, such as issuance of a warning, to protect customers during its distribution of natural gas through its own system and through a customer's service line for a gas appliance." *Lemke*, 243 Neb. at 652, 502 N.W.2d at 92. We find the *Lemke* case instructive.

The record in the instant case provides evidence that NI-Gas was

aware of the potential danger found in homes using certain flexible connectors. The record includes a letter to Mr. O.C. Davis of the Southern California Gas Company from T.J. Croddy of NI-Gas, dated May 24, 1976. That letter provided that "[t]he sudden, mysterious separation of brass connectors and their brazed-on end fittings has been a concern of gas utility people for several years." On December 14, 1979, the United States Consumer Product Safety Commission sent a letter to the president of the American Gas Association (AGA). That letter indicated that corrugated metal connectors, brand-name Cobra, allegedly caused a number of fires in homes. While some jurisdictions did not allow the installation of such connectors, many "may still be in service, and therefore may be susceptible to creating a significant hazard to the occupants of those residences equipped with such connectors." On December 19, 1979, the president of the AGA sent to all its representatives from AGA member-companies a letter stating the United States Consumer Product Commission had notified it that certain flexible connectors manufactured prior to 1968 had an increasing potential to fail over time.

The record here also included copies of the April/May 1975, August/September 1978, June/July 1980, summer/fall 1981, December 1981, June/July 1983, January 1985, May 1986, and June 1987 "Consumer News" notices. The August/September 1978, June/July 1980, summer/fall 1981, and December 1981 notices indicated that an old connector could crack, creating an unsafe condition, when the appliance was moved. The January 1985, May 1986, June 1987, and December 1981 warnings provided: "The U.S. Consumer Product Safety Commission has warned that certain appliance connectors manufactured prior to 1968 may be unsafe. If you are concerned, do not try to move the appliance to inspect the connector. Instead, call a qualified service agency of NI-Gas to make the inspection." These newsletters further demonstrate that NI-Gas was aware of the danger associated with using brazed flexible connectors to transmit its odorized gas.

In the *Halliburton* case, Ola Halliburton was injured and her husband, Clarence, died as a result of an explosion caused by a leaking flexible connector tube on their gas range in February 1985. As early as 1978, the defendant gas company, Public Service Company of Colorado, knew that a large number of connector tubes of the type used in the Halliburton home were failing because of the interaction between its gas and the tubes. *Halliburton*, 804 P.2d at 215. The defendant company started a campaign in 1980 to warn its customers of the risks presented by failing connectors. In February 1980, the defendant held a news conference during which it discussed its

campaign to check customer-owned connectors and to disseminate information about this hazard. Defendant also made several radio and television announcements and sent periodic messages in its newsletter with the customers' monthly billing statements. At the Halliburton trial, however, there was no evidence that plaintiffs had received actual notice of the problems with the connectors. *Halliburton*, 804 P.2d at 215.

An issue in *Halliburton* was whether defendant owed plaintiffs a legal duty to check the connector tube and, if necessary, to take corrective action. The court in *Halliburton* held that the defendant had a duty to check and, if necessary, to correct the connector. *Halliburton*, 804 P.2d at 216. The court wrote:

"Natural gas is considered a product of the selling and distributing company and, because of the recognized hazards connected with the use of natural gas, a higher duty of care is owed by manufacturers and distributors of natural gas." *Halliburton*, 804 P.2d at 215-16.

*Halliburton* is dissimilar to the instant case in that, here, no issue exists regarding a duty to check the connector tube. Importantly, however, the *Halliburton* court wrote:

" 'Whether the law should impose a duty requires consideration of many factors including, for example, the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor.' " *Halliburton*, 804 P.2d at 216, quoting *Smith v. City & County of Denver*, 726 P.2d 1125, 1127 (Colo. 1986).

Also, the court wrote: "The most compelling reason, however, for imposing a duty upon defendant is that its product, natural gas, which contained the corrosive ethyl mercaptan, was a substantial factor in *causing* the deterioration of the connector tube." (Emphasis in original.) *Halliburton*, 804 P.2d at 216. In our view, while not controlling, *Halliburton* is also instructive.

In *Clare v. Bond County Gas Co.*, 356 Ill. 241, 190 N.E. 278 (1934), a historical Illinois case, the court held, "[i]n the absence of notice of defects[,] it is not incumbent upon a gas company to exercise reasonable care to ascertain whether or not service pipes under the control of the property owner or the consumer are fit for the furnishing of gas." *Clare*, 356 Ill. at 244. Therefore, there was no duty imposed upon the gas company to inspect the pipes within Clare's premises and under her control. *Clare*, 356 Ill. at 245. While *Clare* is still good law in Illinois, it is not applicable to resolving the issues in the instant matter.

Plaintiff alternatively argues that if NI-Gas did not owe a common-law duty to warn consumers of the hazards of flexible gas connectors, it undertook that duty when it issued warnings in its consumer newsletter. In plaintiff's view, the warning that was given by NI-Gas "was woefully inadequate" and, therefore, NI-Gas is subject to liability under a voluntary undertaking theory. We hold that NI-Gas does have a duty to warn consumers. However, we neither decide the adequacy of the warnings nor address plaintiff's voluntary undertaking theory.

Plaintiff also asserts that the terms and conditions found in the NI-Gas tariff filed with the Illinois Commerce Commission do not preclude the imposition of a duty on NI-Gas. The NI-Gas tariff on file with the Illinois Commerce Commission on March 1, 1995, provided:

> "*All gas utilization equipment, piping, and vents* furnished by the Customer shall be suitable for the purposes hereof and *shall be installed and maintained by the Customer* at all times in accordance with accepted practice and in conformity with requirements of public health and safety, as set forth by the properly constituted authorities and by the Company.

> The *Company assumes no responsibility in connection with the installation, maintenance or operation of the Customer's equipment* and reserves the right to discontinue service if such equipment is in unsatisfactory condition." (Emphasis added.)

Plaintiff reasons that because her claim against NI-Gas is not based on NI-Gas' *responsibility* in connection with the "installation, maintenance or operation" of her equipment, but its *liability* resulting from NI-Gas' breach of its common-law duty to use reasonable precautions to avoid injury and failure to adequately warn its customers of the hazard, the tariff provision is not applicable.

■ A public utility's legal obligations are determined by the particular provisions of the tariff. *Sarelas v. Illinois Bell Telephone Co.*, 42 Ill. App. 2d 372, 375, 192 N.E.2d 451 (1963). Whether a utility tariff is ambiguous is a question of law and subject to *de novo* review. *Bloom Township High School v. Illinois Commerce Comm'n*, 309 Ill. App. 3d 163, 174, 722 N.E.2d 676 (1999). Although a utility tariff is not a legislative enactment, its interpretation is governed by the rules of statutory construction. *Bloom Township*, 309 Ill. App. 3d at 174.

■ We hold that the plain, unambiguous language of the tariff absolves NI-Gas from liability relative to equipment owned and maintained by the customer. The tariff, however, does not preclude plaintiff's claim that NI-Gas owed a duty to her decedent to warn of the potential hazards of brazed connectors when sulfur-odorized natural gas travels through them. After reviewing the pleadings,

depositions, and admissions on file, we hold, as a matter of law, that a utility company that has actual knowledge of a dangerous condition associated with the use of its product has a responsibility to its customers to warn them of that danger.

## II

Plaintiff also avers that she established good cause for preserving the evidence depositions of the witnesses in question and the trial court abused its discretion in denying her motion to preserve testimony. NI-Gas responds that the trial court did not abuse its discretion in denying plaintiff's motion to preserve testimony because plaintiff had ample time to depose her retained expert witnesses prior to the grant of summary judgment; also, the witnesses were not fact witnesses who were essential to proving plaintiff's case. We agree.

■ Rule 217 provides for the taking of depositions in order to preserve testimony. 134 Ill. 2d R. 217. A trial court may, on a motion and for good cause shown, allow the taking of depositions of witnesses to perpetuate their testimony for use in the event of further proceedings in that court. 134 Ill. 2d R. 217(b).

■ NI-Gas' motion for summary judgment was granted on September 13, 2000. Plaintiff's motion to reconsider was denied on December 22, 2000. Plaintiff represented in her January 12, 2001, motion to preserve testimony that: due to the schedules of the witnesses and the attorneys, she was unable to complete the evidence depositions of her two expert witnesses; and based on the time to complete the appellate process and the age of her experts, she would "suffer great prejudice if the testimony of one or more of her experts is not preserved for trial." The trial court denied the motion to preserve, noting that "[t]hey're not fact witnesses who are essential to proving the Plaintiff's or Defendant's cases. They're retained experts. We substitute experts quite frequently." In our view, the trial court did not abuse its discretion in denying plaintiff's motion. Plaintiff's reasons for not completing the depositions and her need to preserve the testimony fail to demonstrate good cause to warrant preservation.

For the foregoing reasons, we reverse the grant of summary judgment in favor of NI-Gas and remand for further proceedings. We also affirm the denial of plaintiff's motion to preserve testimony.

Affirmed in part; reversed and remanded in part.

McNULTY and TULLY, JJ., concur.